# ANDREW J. CHABROL

## v.

# COMMONWEALTH OF VIRGINIA

Record No. 921464

February 26, 1993

Present: All the Justices

*William R. Brown* for appellant.

*Donald R. Curry, Senior Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

JUSTICE KEENAN delivered the opinion of the Court.

On the morning of July 6, 1991, Melissa Harrington, age 27, was abducted as she was leaving her home to go to work. Later that day, her body was found in the home of Andrew John Chabrol. Chabrol was arrested and indicted for her abduction, rape, and murder.

At the first stage of a bifurcated trial, conducted pursuant to Code § 19.2-264.3 and -264.4, Chabrol pleaded guilty to capital murder in violation of Code § 18.2-31(5)(murder in the commission of, or subsequent to, rape). He also pleaded guilty to rape and abduction with intent to defile. Before accepting his guilty pleas, the trial court examined Chabrol and found that his pleas were made knowingly, voluntarily, and intelligently. Upon agreement of counsel and Chabrol, the court heard from the prosecutor a partial recitation of the Commonwealth's evidence. Thereafter, the court found Chabrol

guilty of all three offenses, ordered a pre-sentence investigation by the probation office, and scheduled a hearing for the penalty phase of the capital murder proceeding.

At the penalty phase hearing, after receiving the testimony of several witnesses called on Chabrol's behalf, the trial court fixed Chabrol's punishment for capital murder at death, based on a finding of vileness. The court also sentenced Chabrol to two terms of life imprisonment for the rape and the abduction offenses. Following this hearing, the trial court ordered the probation office to prepare a post-sentence report on the capital murder charge.[1] Upon consideration of that report, the trial court confirmed its prior sentence of death on the capital murder charge.

Chabrol is before this Court solely for automatic review of his death sentence. Code § 17-110.1 provides, in material part:

A. A sentence of death, upon the judgment thereon becoming final in the circuit court, shall be reviewed on the record by the Supreme Court.

. . . .

C. [T]he court shall consider and determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In accordance with Code § 17-110.2, we have given this matter priority on our docket. We review the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party below. *Cheng v. Commonwealth*, 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990).

---

[1] Although the trial judge ordered a post-sentence report, it was not required under Code § 19.2-264.5. *See Correll v. Commonwealth*, 232 Va. 454, 466-67, 352 S.E.2d 352, 359, *cert. denied*, 482 U.S. 931 (1987).

## I.

## THE EVIDENCE

The evidence showed that, at 6:20 a.m. on July 9, 1991, Chabrol and his friend, Stanley Berkeley, arrived at the home of Melissa Harrington. Attempting to disguise his appearance, Chabrol wore sunglasses, a hat, and a partial wig. He also had changed the license plates on his car. As Harrington approached her car, Chabrol ran toward her and threw his arms around her. As they fell to the ground, Harrington cried out for help.

Chabrol testified that, after he forced Harrington into the back seat of the car, he placed pieces of duct tape over her eyes and mouth and bound her wrists and ankles with packing tape. During the trip to Chabrol's house, which lasted approximately 90 minutes, Berkeley drove the car and Chabrol rode in the back seat with Harrington. Disguising his voice, Chabrol told Harrington that he was taking her to see someone and that she would not be hurt.

When they arrived at Chabrol's house, Chabrol used a knife to cut the tape off of Harrington's legs. He then led her into the bedroom of the house, while Berkeley stayed in the living room.

Prior to the abduction, Chabrol had placed restraining devices in the bedroom. He had secured one looped section of clothesline to each lower corner of the bed. After Chabrol placed these loops over Harrington's ankles, her feet could come no closer than four inches apart. Chabrol also had secured clothesline to both posts at the head of the bed. When he placed Harrington's hands through the loops that he had fashioned there, her hands were bound together above her head.

Using a stiletto, Chabrol next cut the tape down the bridge of Harrington's nose and peeled it back so that she could see him. He told her that he was going to rape her. When Harrington asked if he would let her go after the rape, Chabrol replied that he would. According to Chabrol, Harrington then said, ''okay,'' and he understood her comment to mean that she consented to having sex with him. Previously, Harrington had told him that she feared they ''would cut her hands and her head off and throw her body in a . . . dump.''

Chabrol then cut off Harrington's clothing with the stiletto. He testified that he performed oral sodomy on her and then had sexual intercourse with her. After these events, he left the room.

Berkeley then asked Chabrol if he could go into the bedroom. Chabrol agreed. After Berkeley went into the room, Chabrol looked in on two occasions. Each time, he observed Berkeley on top of Harrington. Chabrol testified that he did not know how many times Berkeley raped her.

After Berkeley left the bedroom, Chabrol went back in and began questioning Harrington. She managed to remove her hand from one restraint and struck him across the face. Chabrol straddled Harrington and put his hand over her mouth. According to Chabrol, he then picked up a ''stun gun,'' which he had purchased in preparation for these offenses, and tried to use it.

Chabrol testified that, at some point during this struggle, ''I lost it. I just went berserk.'' He stated that he remembered ''reaching for her neck'' and, that ''the next thing [he] knew,'' Harrington was lying face down on the bed. He was unable to feel a pulse on her neck. He testified that, upon seeing the stiletto lying close to Harrington, he feared that she would rise and attack him with it, in a manner similar to a scene depicted in the movie ''Fatal Attraction.'' Therefore, he cut Harrington's left hand restraint and tied the clothesline around her neck. He then wrapped duct tape tightly around her head, from her eyebrows to her chin, in order ''to cover her nose to stop her from coming back to life.'' Lastly, he tied a plastic grocery bag over her head.

Chabrol then ran out of the room and told Berkeley that he had killed Harrington. Chabrol decided ''that since she was dead [he] might as well continue on with [his] plan.'' Berkeley helped him clean the bedroom. Chabrol then placed several items in a trash bag for disposal and Berkeley ordered a pizza.

The police knocked on Chabrol's door at approximately 11:50 a.m. Chabrol invited them in. Detective Pat Tucker advised Chabrol that he was not under arrest and that he did not have to talk to the police. When the officers informed Chabrol that they were concerned about Harrington, Chabrol stated that he did not ''care if she's alive or not'' and that he was ''really not interested if anything has happened to her.''

Upon searching Chabrol's house pursuant to a warrant, the officers found Harrington's body in Chabrol's bedroom. They also found a trash bag containing female underclothes, a dress, and a roll of tape. The trash bag also contained some synthetic rope and a blue cap with a portion of a wig tied into it. In Chabrol's garage, the officers found two five gallon containers filled with gasoline.

The officers also found a computer, computer disks, and a box of diaries. The disks contained a journal and various letters written by Chabrol, which revealed his extensive plan to rape and kill Harrington. Harrington and Chabrol had been stationed together at the naval base in Norfolk. Chabrol was one of Harrington's superior officers. Chabrol's journal indicated that, when he had proposed that he and Harrington have an affair, she had refused him. Following her refusal, Chabrol continued to approach Harrington on this subject. As a result, Harrington then informed another superior officer about Chabrol's conduct.

Chabrol's computer journal contained many entries stating that he would seek revenge from Harrington. These entries included statements that "she will suffer in the long run," "I plan to rape her," and "I will give her the final payoff." The journal also revealed specific details of Chabrol's plan to abduct and kill Harrington. Chabrol indicated that he had purchased powdered magnesium because he believed that it would burn at a sufficient temperature to destroy all evidence of Harrington's body. He also testified that he had purchased ten gallons of gasoline to assist in this burning process. In the journal, Chabrol also mentioned that he might try to blame the murder on Harrington's husband.

The evidence also showed that, while Chabrol and Berkeley were both incarcerated in the Chesapeake City Jail, they exchanged notes. In one note, Chabrol instructed Berkeley to "remember as little about me as possible" and to say that he did not see "any action at all." This note also told Berkeley not to mention "necro." Chabrol testified that this word was a reference to necrophilia. He also testified that he agreed to Berkeley's plan to have intercourse with Harrington's body.

Dr. Leah L. E. Bush, who performed an autopsy on Harrington's body, initially observed the body at the scene of the crime. She testified that the body was wrapped in a blanket and that silver duct tape completely covered the victim's face from her eyebrows to her chin. This tape was wrapped very tightly around her entire head. Dr. Bush testified that it would have been very difficult for the victim to have continued to breathe in this situation. In addition to the tape, Dr. Bush also observed that the victim's head was covered with a plastic grocery bag, and that a braided rope was tied tightly around her neck.

During the autopsy, Dr. Bush observed bruises over the victim's collar bone area, her right upper arm, her left posterior arm, her

right leg, and her left knee. Dr. Bush testified that the bruises on the victim's upper right shoulder and collar bone were consistent with blunt trauma. Dr. Bush also noted two paired abrasions, which appeared to have resulted from an electrical burn, on the left posterior thigh of the body. Upon examining the ''stun gun'' purchased by Chabrol, Dr. Bush testified that the gun matched the marks on the victim's thigh. Dr. Bush also found a laceration surrounded by a contusion on the victim's right posterior scalp.

Dr. Bush concluded that Harrington had died as a result of mechanical asphyxia due to suffocation and strangulation. The strangulation was caused by the ligature, as well as manual pressure. Dr. Bush testified that the rope had been tied tightly enough to restrict the flow of blood to the head. She further testified that manual strangulation was evidenced by bilateral conjunctival hemorrhages, spectacle hemorrhages in the eyes, and abrasions in the neck consistent with fingernail marks. Dr. Bush also testified that the tape affixed across the victim's face was potentially lethal. In addition, she testified that the plastic bag, tied around the victim's head, was also, of itself, potentially lethal.

## II.

### SENTENCE REVIEW

As stated above, Code § 17-110.1(C) requires us to review the death sentence imposed upon Chabrol, based on the trial court record, to determine whether (1) it was imposed under the influence of passion, prejudice, or any other arbitrary factor; or (2) it is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Chabrol does not contend, nor does the record suggest, that his death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. In addition to considering the probation office reports, the trial court heard the testimony of several witnesses offered on Chabrol's behalf. Among the individuals who testified were his friends and coworkers, his sister, and Chabrol himself. In giving its reasons for imposing the death sentence, the trial court relied on the complete record before it, including both the offense itself and Chabrol's social history. Further, in reaching its conclusion based on the vileness of the offense, the trial court confined its consideration to the record before it. Thus, we

find no indication that the trial court's decision was affected by passion, prejudice, or any other arbitrary factor.

Chabrol argues that the record does not support the trial court's finding of vileness. He contends that "there is little, if any, vileness in the case at hand when compared to other cases of rape and murder." We disagree.

Code § 19.2-264.2 sets forth the standard employed by the trial court in making its determination. That section provides, in material part:

> In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court . . . shall (1) after consideration of the past criminal record of convictions of the defendant, find . . . that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

Here, the trial court found that Chabrol's conduct "was outrageously and wantonly vile, horrible and inhuman and that it involved torture, depravity of mind and aggravated battery to the victim."

As this Court explained in *Smith v. Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979),

> [w]e construe the words 'depravity of mind' as used [in Code § 19.2-264.2] to mean a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation. Contextually, we construe the words 'aggravated battery' to mean a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder. [Citation omitted]. It seems to us that these are the only constructions rationally related to the commonly accepted connotation of the prefatory words, 'outrageously or wantonly vile, horrible or inhuman.'

*Accord, Davidson v. Commonwealth*, 244 Va. 129, 135, 419 S.E.2d 656, 659-60, *cert. denied*, ___ U.S. ___, 113 S.Ct. 423 (1992);

*Strickler v. Commonwealth*, 241 Va. 482, 496, 404 S.E.2d 227, 237, *cert. denied*, 502 U.S. ___, 112 S.Ct. 386 (1991); *Stockton v. Commonwealth*, 241 Va. 192, 213, 402 S.E.2d 196, 208, *cert. denied*, 502 U.S. ___, 112 S.Ct. 280 (1991); *Quisenberry v. Commonwealth*, 241 Va. 364, 381, 402 S.E.2d 218, 228, *cert. denied*, 502 U.S. ___, 112 S.Ct. 113 (1991).

█ We hold that, under the elements set forth in Code § 19.2-264.2, the record before us fully supports the trial court's determination of the vileness of this offense. Its conclusion that the crimes evidenced a depravity of mind is supported by the egregious, methodical manner in which Chabrol planned and executed these offenses. *See Clark v. Commonwealth*, 220 Va. 201, 217, 257 S.E.2d 784, 794 (1979), *cert. denied*, 444 U.S. 1049 (1980). Chabrol's lack of remorse further supports this conclusion. *See Poyner v. Commonwealth*, 229 Va. 401, 426, 329 S.E.2d 815, 832, *cert. denied*, 474 U.S. 865 and 474 U.S. 888 (1985).

█ Also, the facts of this case overwhelmingly support the trial court's conclusion that the victim was subjected to an aggravated battery and to torture. The series of acts perpetrated by Chabrol on the victim subjected her to both psychological and physical torture, causing her to experience a slow and painful death. Such conduct far exceeded the minimum battery necessary to accomplish an act of murder. *See Smith* at 458, 248 S.E.2d at 149.

█ Chabrol next contends that the imposition of the death sentence was excessive or disproportionate to the penalty imposed in similar cases. In support of this argument, he asserts that the other death sentences affirmed by this Court on the vileness predicate were more egregious. This contention, however, is without merit because proportionality does not require that a given capital murder case ''equal in horror the worst possible scenario yet encountered.'' *Turner v. Commonwealth*, 234 Va. 543, 556, 364 S.E.2d 483, 490, *cert. denied*, 486 U.S. 1017 (1988). Rather, in considering the issue of proportionality, this Court must ''determine whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant.'' *Jenkins v. Commonwealth*, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992).

In accordance with this duty, we have examined the records of all capital murder cases reviewed by this Court, pursuant to Code § 17-110.1(E), giving particular attention to those cases where the death penalty was based solely on the ''vileness'' predicate. One notable

example is *Bunch v. Commonwealth*, 225 Va. 423, 304 S.E.2d 271, *cert. denied*, 464 U.S. 977 (1983), in which we affirmed the capital murder conviction of Timothy Dale Bunch for the slaying of a woman whom he had dated. Like Chabrol, Bunch served in the United States military and had no prior criminal record. Bunch also had planned the murder of his victim well in advance of the crime. After shooting her, Bunch tied a knot in a scarf she was wearing and "hung her up . . . to make sure she didn't talk." *Id.* at 443, 304 S.E.2d at 282. Further, like Chabrol, Bunch did not exhibit remorse for his actions. *Id.*

■ We also have reviewed the records of capital murder cases where a sentence of life imprisonment was imposed. Applying the standard of review for proportionality set forth in *Jenkins*, we hold that the sentence of death imposed upon Chabrol is neither excessive nor disproportionate to the penalties imposed in similar cases.

Having reviewed Chabrol's sentence of death pursuant to Code § 17-110.1, we decline to commute the sentence. Accordingly, we will affirm the judgment of the trial court.

*Affirmed.*