Present:  All the Justices

TONY LESLIE FRY
                        OPINION BY JUSTICE ROSCOE B. STEPHENSON, JR.
v.  Record No. 950673
                                    November 3, 1995
COMMONWEALTH OF VIRGINIA

            FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                    Herbert C. Gill, Jr., Judge

     In this appeal, Tony Leslie Fry challenges a sentence of
death imposed upon him by the trial court.

                                I

     In an indictment, Fry was charged with the capital murder of
Leland A. Jacobs, i.e., the willful, deliberate, and premeditated
killing of Jacobs during the commission of robbery or attempted
robbery while armed with a deadly weapon, in violation of Code
§ 18.2-31(4).  At an arraignment on October 3, 1994, Fry pleaded
guilty to the capital murder charge.  After accepting the plea
and hearing evidence about the commission of the offense, the
trial court found Fry guilty as charged.  On January 5, 1995, the
court received a pre-sentence report prepared by a probation
officer and conducted a sentencing hearing.  Following the
hearing, the court sentenced Fry to death, finding that his
conduct in committing the offense was outrageously and wantonly
vile in that it involved an aggravated battery.  Code §§ 19.2-
264.2 and -264.4.

     On appeal, Fry's sole contention is that the death sentence
is excessive or disproportionate to the penalty imposed in
similar cases.  In addition to review on this ground, we are
required to review the sentence to determine whether it was

imposed under the influence of passion, prejudice, or any other arbitrary factor.  Code § 17-110.1(C)(1).

## II

### A

On February 21, 1994, Officer David L. Suda of the Chesterfield County Police Department was looking for Fry, who had been charged with arson.  Suda drove his automobile to the end of Exter Mill Road in Chesterfield County where the paved road becomes a dirt road.  After driving along the dirt road for a short distance, Suda parked his car and began to walk along the road.  After walking "a couple hundred yards or so," he found some blood spots in the middle of the road and some "drag marks" extending from the blood spots and down the road.  Suda followed the marks for "a couple hundred yards" before returning to his vehicle and proceeding to drive it down the dirt road.

Approximately 100 feet before reaching the blood spots, Suda encountered an approaching vehicle and was met "bumper to bumper" by a gray Ford Explorer without a front license plate and bearing a dealer's price sticker.  Suda approached the vehicle on foot. Fry's friend, Brad Hinson, was the operator of the vehicle, and Fry was sitting in the front passenger seat.  Suda observed blood on Fry's hands and asked Fry for an explanation.  Fry claimed he had hurt himself "playing out in the woods."

Suda grabbed Fry's right hand and advised Fry that he had "some papers for him" relating to the arson charge.  Fry

struggled momentarily when Suda endeavored to handcuff him.  Fry suddenly ceased resisting, however, and said, "I want to kill myself."  Fry then reached for the vehicle's console, saying, "I am going to kill myself."  At that moment, Suda sprayed Fry in the face with mace.

Immediately after Suda handcuffed Fry, Hinson, who was standing outside the vehicle, "dove for the back seat of the car" and grabbed a coat.  At that point, Suda pointed his weapon at Hinson, and Hinson, obeying Suda's order, released the coat, exited the vehicle, and placed his hands on the vehicle's hood.  In the meantime, another officer had arrived on the scene and had taken charge of Fry.

While Suda was advising Fry of his <u>Miranda</u> rights, Hinson ran up to Suda and exclaimed that he "didn't have anything to do with it."  Hinson said that Fry had killed a car salesman a few minutes earlier.  Hinson then led Suda down the dirt road, following the drag marks for 642 feet, and pointed to the location of the body.  Suda found the body, which proved to be that of Jacobs, lying beneath a pile of brush and shingles.

After again being advised of his <u>Miranda</u> rights, Fry gave a statement to Suda and later gave a more detailed statement, which was transcribed, to other police officers.  In those statements, Fry admitted that he had shot Jacobs several times and that he and Hinson had tied Jacobs' necktie to the bumper of the Ford Explorer and had dragged Jacobs down the dirt road.  Fry further

admitted that Hinson "just . . . helped [him] move the body and . . . steal the vehicle" and that Hinson had gone through Jacobs' wallet.

Fry further related to the police that, during the previous night, he and Hinson had planned to steal a new car from a dealership on the pretense of conducting a test drive and then to use it to leave the area. They also had decided to kill any salesperson who insisted on accompanying them.

The next day, Fry and Hinson went to the Bennett Ford dealership and asked for Jacobs because Fry previously had talked with Jacobs about a car. They told Jacobs that Fry had to show the vehicle to his grandmother who lived in the Exter Mill area of Chesterfield County.

Fry, accompanied by Hinson and Jacobs, drove the vehicle down the dirt road where he stopped on the pretense of checking the spare tire. The three men exited the car, and Jacobs walked to the rear of the vehicle to check the tire. Then, as Jacobs walked away from the vehicle, smoking a cigarette, Fry told Jacobs to "look at that owl," at which time Fry shot Jacobs in the back. Jacobs exclaimed, "What's going on?" and tried to run to the vehicle. More shots were fired into Jacobs while he pleaded not to be killed. After the additional shots had been fired, Jacobs was in so much pain that he begged Fry to "go ahead and . . . finish me off." The last shot was fired at close range near the front of Jacobs' face.

The medical examiner testified that Jacobs died as a result of 11 gunshot wounds to his head, chest, and abdomen. Three of the 11 shots were to Jacobs' head, one of which entered his brain and alone was lethal. Four bullets were fired into the front of Jacobs' chest, injuring his heart and lungs. One bullet, fired into Jacobs' upper abdomen, injured his liver. The medical examiner opined that any one of these bodily wounds was potentially lethal. There also were three gunshot wounds in Jacobs' back, one of which injured his kidneys and aorta. According to the medical examiner, only the lethal wound to the brain was capable of causing an immediate loss of consciousness.

The medical examiner also found on the top, rear of Jacobs' head a large scrape that was consistent with Jacobs' having been dragged by the Ford Explorer. The examiner opined that it was more likely than not that Jacobs was alive when dragged because the scrape was very red.

B

In the penalty phase of the trial, the Commonwealth presented evidence that Fry had broken into, and stolen property from, three churches and a fire department. Fry also had admitted to setting fire to two residences, to vandalizing automobiles, and to having activated 10 to 12 false fire alarms. Additionally, Fry admitted that he and a friend had dug up a grave site and had removed the corpse's skull because he wanted to "see what a man looked like after he was dead."

The owner of Bennett Ford described Jacobs as a very kind person and an excellent employee. He also testified that, since the murder, his sales force has been reluctant to accompany male customers on test drives, and his top salesperson, a female, is afraid to accompany male customers to the dealership's rear lot after dark.

Jacobs' widow testified that her husband was 42 years old when he was murdered. She described Jacobs as a kind and loving husband and father to her young son. Since her husband's murder, Mrs. Jacobs has suffered severe anxiety and depression, requiring medication. She has been taken to the hospital two or three times, has missed nine weeks of work, and has undergone counseling. Her son also has been adversely affected by his stepfather's murder.

Fry presented extensive evidence about his background. Fry had been abandoned by his mother and had never known the identity of his father. Lois White, Fry's great-aunt, testified that Fry had been raised by his maternal great-grandmother, Alma Lipford. Although Fry had attended a church and sang in the choir, he had had few friends. He also had not been involved in athletics or other organized activities. White also testified that she never had seen Fry resort to violence, and she said that Fry was very remorseful for what he had done. Alma Lipford testified that she had provided for Fry's material needs and raised him "like a son," and she essentially corroborated Lois White's testimony

about Fry's background, experiences, and attitude.

A high school guidance counselor testified that Fry had been enrolled in a special education class for the emotionally disturbed. The counselor also testified that Fry's academic performance had been "low average" and that Fry had experienced difficulty performing in the lowest level classes.

An inmate in the county jail had known both Fry and Hinson approximately a year and a half. The inmate believed that Hinson was "the leader of [Fry]."

A psychologist testified that Fry's full scale IQ score of 77 was in the low average range of intelligence. Fry performed spelling and reading skills at the fifth grade level, and he performed arithmetic skills at the ninth grade level. The psychologist diagnosed Fry as suffering from a dependent personality disorder and stated that Fry presented some features of void and schizoid personality disorders, but that Fry does not suffer from a mental illness.

A physician, who emphasizes counseling in his practice, opined that Fry's personality disorders and retarded social development resulted from his abandonment by his mother and the peculiarities of his great-grandparents' household. The doctor conceded, however, that Fry does not suffer from mental illness or mental retardation.

Four police officers testified that Fry had been polite, respectful, and forthright about his involvement in Jacobs'

murder and the other criminal activities.  The manager of a supermarket where Fry had worked after school also described Fry as polite and respectful.

### III

### A

As we have said, Fry's sole contention on appeal is that his death sentence is excessive or disproportionate to the penalty imposed in similar cases.  He compares his case to other cases in Chesterfield County which, he asserts, were more egregious examples of "vileness."  He also asserts that the following factors militate against imposition of the death sentence:  his age (19 years) at the time of the murder; his role in the offense (arguing that he was the "triggerman, but not the supplier of the weapon or ammunition" and that he was the "follower, not leader"); his family background; his psychological background; his attitude towards the police (i.e., polite, respectful, cooperative); and his attitude towards the crime (i.e., remorseful).

Code § 17-110.1(C)(2) requires this Court to consider and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  The standard governing our proportionality review, however, "does not require that a given capital murder case `equal in horror the worst possible scenario yet encountered.'"  Chabrol v. Commonwealth,

245 Va. 327, 335, 427 S.E.2d 374, 378 (1993), quoting Turner v. Commonwealth, 234 Va. 543, 556, 364 S.E.2d 483, 490, cert. denied, 486 U.S. 1017 (1988). Rather, we determine "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. ___, 113 S.Ct. 1862 (1993); Code § 17-110.1(C)(2). Moreover, we do not confine our review to a single city or county; instead, we compare the case before us to all capital murder cases this Court has reviewed, giving particular attention to cases similar in crime and aggravating factor. Cardwell v. Commonwealth, 248 Va. 501, 516-17, 450 S.E.2d 146, 156 (1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1826 (1995); Chabrol, 245 Va. at 335, 427 S.E.2d at 378-79; Coppola v. Commonwealth, 220 Va. 243, 259, 257 S.E.2d 797, 808 (1979), cert. denied, 444 U.S. 1103 (1980).

To this end, we have considered the compilation of the records of all capital murder cases reviewed by this Court pursuant to Code § 17-110.1(E), paying particular attention to those cases in which the sentence of death was based upon the "vileness" factor. Our review reveals that the present case is comparable to a number of capital murder cases in which the predicate offense was robbery and the sentence of death was imposed based upon the "vileness" factor. See, e.g., Cardwell, supra; Turner, supra; Correll v. Commonwealth, 232 Va. 454, 352

- 9 -

S.E.2d 352, <u>cert</u>. <u>denied</u>, 482 U.S. 931 (1987); <u>Wise</u> v. <u>Commonwealth</u>, 230 Va. 322, 337 S.E.2d 715 (1985), <u>cert</u>. <u>denied</u>, 475 U.S. 1112 (1986); <u>Boggs</u> v. <u>Commonwealth</u>, 229 Va. 501, 331 S.E.2d 407 (1985), <u>cert</u>. <u>denied</u>, 475 U.S. 1031 (1986); <u>Jones</u> v. <u>Commonwealth</u>, 228 Va. 427, 323 S.E.2d 554 (1984), <u>cert</u>. <u>denied</u>, 472 U.S. 1012 (1985).

After conducting the requisite proportionality review, we conclude that Fry's sentence of death is neither excessive nor disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth.  We agree with the trial court's assessment that Fry's conduct in committing the offense "was outrageously and wantonly vile, horrible, inhumane, . . . and that [he] committed an aggravated battery."

                                   B

Although Fry does not contend that his sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, we also are required to consider and determine whether the sentence was so imposed.  Code § 17-110.1(C)(1).

From an examination of the record, we do not find that the sentence of death resulted from any arbitrary factor.  To the contrary, the record fully supports the conclusion that the trial court acted with extreme care in applying the law to the undisputed facts surrounding the commission of the crime and gave full consideration to Fry's evidence in mitigation.

                                  IV

In sum, we conclude, from the sentence review required by Code § 17–110.1, that Fry's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor and is not excessive or disproportionate to the penalty imposed in similar cases.  Accordingly, we will affirm the sentence of death.

<u>Affirmed</u>.