Present:  All the Justices

DAVID LESTON OVERTON, JR.

v. Record No. 000552  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        November 3, 2000
COMMONWEALTH OF VIRGINIA

From the Circuit Court of Chesterfield County
John F. Daffron, Jr., Judge


    In this capital murder case, the defendant asks this

Court to commute his sentence of death to life

imprisonment.  He contends that the circuit court imposed

the death penalty under the influence of passion or

prejudice, and that his sentence of death is

disproportionate to sentences imposed in factually

comparable cases.  Finding no merit in the defendant's

arguments and after reviewing his sentence of death

pursuant to Code § 17.1-313(C), we will affirm the judgment

of the circuit court.

## MATERIAL PROCEEDINGS

    David Leston Overton, Jr., pled guilty to the capital

murder of Edgar Allen Williams, a 63-year-old quadriplegic.

After accepting Overton's guilty plea and finding him

guilty of capital murder, the circuit court heard evidence

in aggravation and mitigation of the offense.[1]  At the

_____

    [1] Overton also pled guilty to robbery and statutory
burglary while armed with a deadly weapon.  After finding

conclusion of the penalty-phase hearing, the court sentenced Overton to death on the capital murder conviction, finding that Overton's conduct in committing the murder was outrageously or wantonly vile in that it involved an aggravated battery to the victim.[2]

Pursuant to Code § 17.1-313(C), we now undertake the mandatory review of Overton's sentence of death to determine whether it was imposed "under the influence of passion, prejudice or any other arbitrary factor," and whether his sentence is excessive or disproportionate to penalties imposed in this Commonwealth in similar cases, "considering both the crime and the defendant."

FACTS

On the morning of February 26, 1999, a detective with the Chesterfield County Police Department responded to a call concerning a dead individual at Williams' residence.

_____

Overton guilty of these charges, the circuit court sentenced Overton to life imprisonment on the robbery conviction, and to 20 years on the statutory burglary conviction. Overton did not appeal those convictions.

[2] The circuit court did not include its finding of the "vileness" predicate in its sentencing order dated December 14, 1999. Consequently, this Court remanded the case to the circuit court for clarification of its sentencing order. In a subsequent order, the court found "beyond a reasonable doubt that the defendant's conduct in committing the offense . . . was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity

Upon arriving at the scene and entering the house, the detective found Williams lying on his back in his bed. Williams appeared to be deceased. The shirt that Williams was wearing was marked with numerous holes and red stains. The telephone in the bedroom had been pulled from the wall. During a search of Williams' house, the police discovered over $40,000 in cash and 11.88 grams of cocaine.

A subsequent autopsy of Williams' body revealed that he had sustained 21 stab wounds and one incised wound. Three of the numerous stab wounds to Williams' chest were each lethal wounds. Although approximately 90 percent of the wounds were located in the chest region, four stab wounds were inflicted in the neck area. However, there were no defensive injuries on Williams' body nor any other bruising that would indicate his assailant had hit or punched Williams. On the autopsy report, the cause of death was listed as "[e]xsanguination due to stab wounds of [the] chest."

Overton confessed to the murder of Williams. That confession, along with testimony from Overton's girlfriend, Tina Marie Middlebrook, establishes the following pertinent facts. On the evening of Williams' murder, Overton,

_____

of mind or an aggravated battery to the victim." The case was then returned to this Court.

3

Middlebrook, and Eric Brown, a friend of Overton, were "doing drugs" in a motel room.  Overton and Brown left the motel and traveled by car to Williams' house.  On the way to Williams' home, they stopped at a convenience store and purchased a flashlight so Overton could see what he was doing without having to turn on the lights in Williams' house.  After they arrived at Williams' home, Brown stayed in the car, and Overton entered the house, apparently the door was not locked, and walked into Williams' bedroom.  Williams then turned on the light beside his bed and started demanding to know why Overton was there so late at night.  At that point, Overton, in his words, "blacked out and did it[,] . . . stabbed [Williams] with a knife somewhere in his upper chest."  Overton described the knife he used as a "skinning knife."  Overton then grabbed what money he could see and a gun lying in a drawer of a nightstand, and left Williams' house.[3]

---

[3] Overton had been to Williams' house with Middlebrook on many occasions to buy drugs from Williams.  In fact, Overton admitted that he had gone to Williams' house a couple of days before the murder "to do it" but got scared because he was not "high."

4

On their way back to the motel, Overton threw the knife out the car window.[4]  After he and Brown returned to the motel, Middlebrook observed a gun and rolls of money in Overton's coat pocket, and blood on his sleeve.  She asked Overton what he had done, and Overton admitted that he had killed Williams.  The three individuals then went to Richmond to buy more drugs.  Overton was arrested approximately two weeks later.

At Overton's sentencing hearing, the Commonwealth introduced evidence with regard to the "vileness" predicate.  The court heard victim impact testimony from Williams' two daughters, his ex-wife, a friend, and caretakers.  The forensic pathologist who performed the autopsy on Williams' body described the numerous stab wounds as the Commonwealth introduced into evidence pictures of the victim and the wounds.  The pathologist opined that Williams may have been aware of what was happening but that he would have become unconscious within minutes.

Finally, the Commonwealth presented testimony from a doctor who had treated Williams.  Although Williams was a quadriplegic, the doctor testified that Williams was able

---

[4] After Overton was arrested, he took two police officers to the location where he had thrown the knife.

to move his shoulders and arms, though the muscle function in his hands was severely limited. Williams had normal sensation throughout both arms and down to a "dermatoma level in the skin" halfway between his collar bone and nipple. Thus, the doctor opined that the majority of the stab wounds inflicted on Williams were at or above the point where Williams' sensation was intact.

Overton then presented evidence in mitigation of the offense. Members of his family testified that Overton was "remorseful" and accepted responsibility for his crimes. A licensed clinical psychologist stated that, when he treated Overton on eight occasions approximately four years before Overton committed the present crimes, Overton was "upset" and "sad" about the "fights" and "conflict" in his home. Finally, Overton submitted a letter to the circuit court in which he stated, "I do not wish to fight this. I humbly request that you respect the family's [Williams' family] wishes in sentencing me to death."

## ANALYSIS

Overton does not assign any errors on appeal except with respect to the two questions that this Court must address in our statutorily mandated review. See Code § 17.1-313(C). In his first assignment of error, Overton

---

The officers recovered the knife at that spot.

6

asserts that his sentence of death was imposed under the influence of passion, prejudice, or other arbitrary factors for three reasons: (1) that the circuit court was improperly swayed by the emotional testimony of Williams' family and friends; (2) that the "graphic pictures" of the victim improperly influenced the court; and (3) that Overton's letter to the circuit court requesting that the death sentence be imposed impacted the court's sentencing decision. In his second assignment of error, Overton contends that his sentence of death is disproportionate because defendants in factually comparable cases have received only life sentences. We do not agree with Overton's arguments.

With regard to Overton's assertion that the circuit court was improperly influenced by the victim impact testimony from Williams' family and friends, and by the photographs of the victim and the stab wounds, we find that Overton failed to object at the sentencing hearing either to the victim impact testimony or to the introduction of the photographs. His failure to make contemporaneous objections at trial precludes consideration of those issues on appeal. Rule 5:25; see also Cherrix v. Commonwealth, 257 Va. 292, 310, 513 S.E.2d 642, 654, cert. denied, ___

7

U.S. \_\_\_, 120 S.Ct. 177 (1999) (defendant waived argument for failure to object in trial court).

Turning to Overton's letter addressed to the circuit court, we note that the court stated at the sentencing hearing that it had "not considered the defendant's request to die as an aspect or component of the sentencing decision." Nevertheless, Overton insists that his request to die had to influence the court's sentencing determination. However, we are unwilling to disregard the court's unequivocal statement that it did not consider Overton's request. " 'A judge, unlike a juror, is uniquely suited by training, experience and judicial discipline to disregard potentially prejudicial comments . . . .' " Smith v. Commonwealth, 239 Va. 243, 268, 389 S.E.2d 871, 885, cert. denied, 498 U.S. 881 (1990) (quoting Eckhart v. Commonwealth, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981)). Thus, we conclude that Overton's sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

The second part of our review, as well as Overton's second assignment of error, addresses the question whether his "sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17.1-313(C)(2). Relying

8

on several cases in which defendants convicted of capital murder received life sentences rather than the death penalty, such as Robinson v. Commonwealth, 231 Va. 142, 143, 341 S.E.2d 159, 160 (1986), and Simpson v. Commonwealth, 227 Va. 557, 560, 318 S.E.2d 386, 388 (1984), Overton argues that the facts of the present case demonstrate that his sentence of death is disproportionate to sentences generally imposed in this Commonwealth for similar crimes.  Those facts, according to Overton, include his age of 19 at the time of the offenses; his dysfunctional family; his drug use, especially on the day of the offenses as opposed to a few days earlier when he was not "high" enough to commit the crimes; Williams' sale of drugs to Overton and his girlfriend; the absence of defensive wounds on Williams' body, which, according to Overton, indicates that he did not beat Williams; his confession and cooperation in helping the police recover the murder weapon; and his criminal record that consists of only three prior convictions: possession of a concealed weapon, petty larceny, and possession of stolen property.

Pursuant to Code § 17.1-313(E), we have accumulated the records of all capital murder cases reviewed by this Court.  Those records include not only those cases in which the death penalty was imposed, but also those cases in

9

which either the trial court or jury imposed a life sentence instead of the death penalty and the defendant filed a petition for appeal with this Court.  Orbe v. Commonwealth, 258 Va. 390, 404, 519 S.E. 2d 808, 816 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1970 (2000); Whitley v. Commonwealth, 223 Va. 66, 81, 286 S.E.2d 162, 171, cert. denied, 459 U.S. 882 (1982).  In complying with the directive in Code § 17.1-313(C)(2) to compare "similar" cases, we have given particular attention, in conducting the review of Overton's sentence of death, to those cases in which the underlying felony predicate, and the facts and circumstances surrounding the commission of the crimes were similar to those in this case.  We have also focused on cases in which the death penalty was imposed solely on the basis of the "vileness" factor.

If we conduct, as Overton did, a selective review of those records, it is possible to find comparable cases in which defendants received death sentences as well as comparable cases in which defendants received life sentences.  For example in Robinson, discussed by Overton on brief, the defendant used a pair of scissors to inflict lethal stab wounds to two individuals during the course of a robbery in one of the victim's townhouse.  231 Va. at 146, 341 S.E.2d at 161.  The defendant had gone to the

10

townhouse twice on the day of the murder, first because his car had been towed and second ostensibly to pay his rent. Id. at 145, 341 S.E.2d at 161.  However, the defendant received a life sentence instead of the death penalty on each of two convictions of capital murder.  Id. at 143, 341 S.E.2d at 160.

In contrast, the 21-year-old defendant in Boggs v. Commonwealth, 229 Va. 501, 505-06, 331 S.E.2d 407, 411 (1985), cert. denied, 475 U.S. 1031 (1986), received the death penalty for the capital murder of his neighbor, who was an 87-year-old widow.  The defendant planned the murder and went to the victim's home for a friendly visit.  Id. at 507, 331 S.E.2d at 413.  He then inflicted multiple blunt-force blows with a metal rod to the victim's head and neck, and stabbed her in the shoulder and chest.  Id. at 507, 331 S.E.2d at 413.

However, our proportionality analysis encompasses all capital murder cases presented to this Court for review and is not limited to cases selectively chosen.  Id. at 522, 331 S.E.2d at 422.  Additionally, the question of proportionality does not turn on whether a given capital murder case "equal[s] in horror the worst possible scenario yet encountered."  Turner v. Commonwealth, 234 Va. 543,

11

556, 364 S.E.2d 483, 490, cert. denied, 486 U.S. 1017 (1988).

Thus, upon reviewing the records of all capital murder cases presented to this Court, including those cases cited by Overton, and giving particular attention to cases involving the predicate offense of robbery and the "vileness" factor, we conclude that Overton's sentence of death is not excessive or disproportionate to sentences generally imposed in this Commonwealth for capital murders comparable to Overton's murder of Edgar Allen Williams. See, e.g., Fry v. Commonwealth, 250 Va. 413, 416-17, 463 S.E.2d 433, 435 (1995), cert. denied, 517 U.S. 1110 (1996) (11 gunshot wounds to victim's head, chest, and abdomen; victim dragged down dirt road while alive); Barnes v. Commonwealth, 234 Va. 130, 133, 360 S.E.2d 196, 199 (1987), cert. denied, 484 U.S. 1036 (1988) (victim sustained multiple gunshot wounds); LeVasseur v. Commonwealth, 225 Va. 564, 571, 304 S.E.2d 644, 647 (1983), cert. denied, 464 U.S. 1063 (1984)(three stab wounds, 40 other wounds inflicted on victim; carving fork and ice pick left in victim); Quintana v. Commonwealth, 224 Va. 127, 134, 295 S.E.2d 643, 645 (1982), cert. denied, 460 U.S. 1029 (1983) (victim died from multiple hammer blows to head, neck, and back); Bennett v. Commonwealth, 236 Va. 448, 452, 374

12

S.E.2d 303, 306 (1988), <u>cert</u>. <u>denied</u>, 490 U.S. 1028 (1989) (victim died from multiple blunt impact injuries to head, face, and right hand; stabbed three times in neck, once in abdomen; and strangled).[5]  Overton did, after all, inflict 21 stab wounds on a 63-year-old quadriplegic.

"The purpose of our comparative review is to reach a reasoned judgment regarding what cases justify the imposition of the death penalty."  <u>Orbe</u>, 258 Va. at 390, 519 S.E.2d at 817.  Although we cannot insure that "complete symmetry" exists among all death penalty cases, "our review does enable us to identify and invalidate a death sentence that is 'excessive or disproportionate to the penalty imposed in similar cases.' "  <u>Id.</u> (quoting Code § 17.1-313(C)(2)); <u>see</u> <u>also</u> <u>Tennessee v. Bland</u>, 958 S.W.2d 651, 665 (Tenn. 1997), <u>cert.</u> <u>denied</u>, 523 U.S. 1083 (1998) (court's "function in performing comparative review is not to search for proof that a defendant's death sentence is

_____

[5] We cite these cases to show that the death penalty is generally imposed in this Commonwealth for capital murders similar to the one in this case.  <u>See</u> <u>Payne v. Commonwealth</u>, 257 Va. 216, 223, 509 S.E.2d 293, 298 (1999) (from our accumulated records, we determine whether juries in this Commonwealth generally approve the death penalty for comparable crimes).  "The test is not whether a jury may have declined to recommend the death penalty in a particular case but whether generally juries in this jurisdiction impose the death sentence for conduct similar to that of the defendant."  <u>Stamper v. Commonwealth</u>, 220

perfectly symmetrical, but to identify and invalidate the aberrant death sentence").

For these reasons, we find no error in the imposition of the death penalty in this case, nor do we perceive any reason to commute Overton's sentence of death to life imprisonment.  Accordingly, we will affirm the judgment of the circuit court.

Affirmed.

---

Va. 260, 283-84, 257 S.E.2d 808, 824 (1979), cert. denied, 445 U.S. 972 (1980).