MARIO MURPHY

v.

COMMONWEALTH OF VIRGINIA

Record No. 930104

June 11, 1993

Present: All the Justices

*Michael F. Fasanaro, Jr. (Abrons, Fasanaro & Sceviour*, on brief), for appellant.

*Donald R. Curry, Senior Assistant Attorney General (Stephen D. Rosenthal, Attorney General*, on brief), for appellee.

JUSTICE HASSELL delivered the opinion of the Court.

On appeal, we review the capital murder conviction and death sentence imposed upon Mario Benjamin Murphy for the murder of James L. Radcliff.

## I. Proceedings

On December 2, 1991, Murphy was indicted by a grand jury for capital murder for hire, in violation of Code §§ 18.2-31(2) and 18.2-10, and for conspiracy to commit capital murder in violation of Code §§ 18.2-22 and 18.2-31. He pled guilty to both offenses.

Before accepting the pleas, the trial court questioned Murphy and made a determination that his guilty pleas were made voluntarily, intelligently, and knowingly. Murphy and the Commonwealth stipulated evidence that would have been adduced in the event the case had been tried.

The trial court scheduled a separate hearing to consider evidence before fixing punishments. The trial court also received the probation officer's report in the manner prescribed by law. After considering the evidence and stipulated facts, the trial court found that Murphy's conduct in murdering James Radcliff constituted an aggravated battery, demonstrated depravity of mind, and revealed that Murphy represented a continuing serious threat to society. The trial court fixed Murphy's punishment at death for capital murder and 20 years imprisonment for conspiracy to commit capital murder.

We have consolidated the automatic review of Murphy's death penalty with his appeal of the capital murder conviction, Code § 17-110.1(A) and (F), and have given them priority on the docket, Code § 17-110.2.

## II. Facts

On July 28, 1991, Murphy, who was 19 years old, met his friend, James Hall, at a house in Virginia Beach. Hall's roommate, Gary Hinojosa, approached Murphy ''with a proposition to take somebody out.'' Hinojosa offered Murphy about $5,000 to kill James Radcliff (James). Hinojosa had a sexual relationship with James' wife, Robin Radcliff (Robin), and she was pregnant with Hinojosa's child. Murphy had never met the Radcliffs.

Murphy decided to kill James. Hinojosa, Robin, and Murphy agreed upon a plan of execution. Hinojosa told Murphy that Robin would place a telephone call to her husband later that evening from a shopping center in Virginia Beach and inform him that her car

"had broken down." According to the plan, when James arrived to assist his wife, Murphy would shoot him with a shotgun.

In furtherance of this plan, Murphy borrowed a car from Michael Bourne, Robin's son-in-law. Murphy drove the car to a neighborhood near the shopping center where the murder was to occur. He parked the car, alighted, and waited nearby "in the bushes." He was dressed in dark clothing and was armed with a single-barrel shotgun that he had borrowed from a friend. Even though Murphy was prepared to kill James at that time, "nobody ever showed up." Murphy went to a pay telephone, called Hinojosa, and informed him that the plan had not been successful.

Murphy returned to Hinojosa's home. Hinojosa suggested that Murphy stage a burglary at the Radcliffs' apartment later that evening and kill James. Murphy responded, "we can try that." Murphy then made "a couple phone calls to get some other people to help." He recruited two persons, his 17-year-old friend, Aaron Turner, and James Hall. Murphy informed Turner that Hinojosa had agreed to pay for the murder with proceeds from the sale of stock owned by Robin or from insurance proceeds that she would collect following her husband's death. Murphy initially intended to divide the $5,000 with Turner, but when Hall agreed to assist in the murder, Murphy decided to "split it even three ways."

In preparation for the planned killing, Robin drove Murphy to the apartment complex where she and her husband lived. She identified their apartment and showed Murphy her husband's car.

On the night of July 28, Murphy, Turner, and Hall met at Hinojosa's residence. Murphy, Turner, and Hall were dressed in dark clothes and were armed with a metal pipe and two knives. Around midnight, Michael Bourne drove them to the Radcliffs' apartment. When they arrived at the apartment complex, Murphy, Turner, and Hall got out of the car. Before leaving, Bourne told them he would meet them at a designated location after they had left the Radcliffs' apartment. Murphy, Turner, and Hall searched the trunk of Robin's car for a .25-caliber pistol Bourne said would be found there. They were unable to find the pistol.

Murphy, Turner, and Hall entered the Radcliffs' apartment through a back bedroom window that Robin had unlocked and left partially open as planned. Robin and her daughter, Tina Bourne, had told Murphy the specific bedroom in which James would be asleep.

When Murphy, Turner, and Hall entered the hallway leading to the bedroom, Robin left the bedroom, walked past the assailants, and went to the living room. The three men entered the bedroom where James was sleeping and closed the door. Turner struck James

"pretty hard" in the head with a metal pipe. James then sat up in bed and Turner handed the pipe to Murphy, who hit James in the head with the pipe at least twice.

James appeared to be "knocked out" as a result of the blows to his head. Murphy and Turner began stabbing him. Murphy "had a big rush of adrenaline" and he stabbed the victim twice, "once in the front of . . . his upper body and then once in the back." Turner placed a knife to James' neck and "tried to slit his throat." Hall, "right behind" Murphy and Turner, was hitting James with a pipe.

James "was just laying in the bed bleeding." Murphy grabbed a telephone in the bedroom and handed it to Hall, who "ripped it out of the wall." Murphy, Turner, and Hall ran from the bedroom to the living room, where they removed a videocassette recorder and a video game. Hinojosa, Robin, and Tina and Michael Bourne had instructed them to remove these items "to make it look like a burglary." Murphy, Turner, and Hall placed these items in a duffel bag. They left the apartment through the window that they had entered.

They met Michael Bourne at the designated location, placed the duffel bag in the trunk of his car, and returned to Hinojosa's residence. There, they discussed the murder with Tina Bourne and Hinojosa. Murphy, Turner, and Hall then changed their clothes, placed the clothing they had been wearing, the murder weapons, and some bricks in the duffel bag with the items removed from the apartment. Murphy and Hall placed the duffel bag in a car, drove to a causeway on the Hampton Roads Tunnel, and threw the duffel bag into the Chesapeake Bay.

The Virginia Beach Police Department received an emergency telephone call at 2:29 a.m. on July 29, 1991 from the Radcliffs' neighbor. Robin had knocked on her neighbor's door, screaming and requesting help. Robin told her neighbor that intruders "had broken into her apartment," and she asked her neighbor to call for an ambulance. When the police officers arrived, Robin was sitting on the floor in her apartment crying.

Robin told the police officers that her videocassette recorder had been stolen. Then, she stated, "he's in there" and pointed to her bedroom. The police officers went to the bedroom and found James lying in the bed with covers pulled up to his waist. He was unresponsive and bleeding profusely, "covered in blood from his head to his waist" and "gasping and gurgling." He was transported to a hospital, where he was pronounced dead at 4:08 a.m.

Arrested by Virginia Beach police officers on September 4, 1992, Murphy waived his constitutional rights and gave a confession in which he admitted to killing James.

## III. Issues Waived

Murphy assigns as error that "imposition of the death penalty violates the 8th Amendment's prohibition against cruel and unusual punishment, the 6th Amendment's guarantee to a fair trial and the 14th Amendment's guarantee that no person shall be deprived of life, liberty or property without due process of law." This assignment of error seeks to raise issues that Murphy waived by the entry of his guilty plea and, thus, these issues are not cognizable in this appeal. *Savino* v. *Commonwealth*, 239 Va. 534, 539, 391 S.E.2d 276, 278, *cert. denied*, 498 U.S. 882 (1990); *Stout* v. *Commonwealth*, 237 Va. 126, 131-32, 376 S.E.2d 288, 291, *cert. denied*, 492 U.S. 925 (1989).

## IV. Mitigation Evidence

Murphy argues that the trial court failed to consider fully evidence he offered in mitigation of the imposition of the death penalty. He contends that the trial court made certain remarks which suggested to him that the judge "had made up his mind, as to the sentence he was to adjudge, before ever hearing the mitigating evidence."

Murphy identifies certain mitigating factors that he believes the trial court did not consider. For example, Murphy says that he did not react violently when arrested and he was cooperative with the police; that he confessed and took police to the area where the evidence was disposed; that he spoke to Aaron Turner and recommended that Turner cooperate with police; that he pled guilty to the offenses; that he had been recruited into the conspiracy by Hinojosa; that he had no prior history of violence and no prior felony convictions; that he had no criminal record as a juvenile; that he had grown up in a troubled home; that he had been a model prisoner in the Virginia Beach Correctional Center; that he had not received money for the murder for hire; that he had seen a psychiatrist some years earlier for an attention deficit problem; that he had saved his stepfather's life; that he had expressed sorrow and remorse; and that he had asked for mercy.

We find no merit in Murphy's contentions. Following the hearing to fix punishments, the court stated:

The court realizes the awesome responsibility it has in this sentencing. I've listened very carefully today to all the evidence, to the very fine argument of counsel — that's to both sides—and I've spent a considerable amount of time in researching and in soul searching, not just in the half hour I was in my office but certainly during the almost two months I guess it's been since the time you pled guilty to these offenses.

Mr. Murphy, you've demonstrated a complete understanding of what is going on during these proceedings. You've been represented by a fine and experienced trial attorney. The court has considered all the evidence in this case, the report of the probation officer, the argument of counsel, the mitigating factors such as lack of a substantial prior criminal record, your age at the time of the commission of this offense, your cooperation with the police and in your adjustment in jail.

Our review of the record convinces us that the trial court did consider all the evidence in mitigation. As we have observed:

While this evidence was mitigating in that it showed "extenuating circumstances tending to explain, but not excuse, his commission of the crime," *Coppola* v. *Commonwealth*, 220 Va. 243, 253, 257 S.E.2d 797, 804 (1979), *cert. denied*, 444 U.S. 1103 (1980), it did not require as a matter of law that the death penalty not be imposed in this case. It was the fact finder's duty to consider this evidence with the other evidence in determining the appropriate sentence. The fact finder was not required to give controlling effect to the mitigating evidence.

*Correll* v. *Commonwealth*, 232 Va. 454, 468-69, 352 S.E.2d 352, 360, *cert. denied*, 482 U.S. 931 (1987).

▮ After the trial court heard the evidence presented during the penalty phase of the trial, the court pronounced the sentences after a 30-minute recess. Murphy argues that "[i]t is inconceivable that the Court could have fully digested [his evidence in mitigation] in the thirty (30) minutes the Court 'deliberated.' " Murphy's argument is meritless. The trial court's comments referenced above demonstrate that the court maturely, carefully, and calmly deliberated the full range of issues. *See Waye* v. *Commonwealth*, 219 Va. 683, 702, 251 S.E.2d 202, 213, *cert. denied*, 442 U.S. 924 (1979) (jury deliberation of 25 minutes "provides no indication" that the jury "did not maturely, carefully, and calmly deliberate the full range of issues or

. . . make an individualized decision on the defendant's sentence" of death).

## V. Aggravated Battery

Murphy argues that the death penalty should not be imposed because his conduct does not rise to the level of an aggravated battery. We disagree. Code § 19.2-264.2 states:

In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

█ "[W]e construe the words 'aggravated battery' to mean a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." *Smith* v. *Commonwealth*, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), *cert. denied*, 441 U.S. 967 (1979); *accord, Mueller* v. *Commonwealth*, 244 Va. 386, 411, 422 S.E.2d 380, 395-96 (1992), *cert. denied*, ___ U.S. ___, 113 S.Ct. 1880 (1993); *Davidson* v. *Commonwealth*, 244 Va. 129, 135, 419 S.E.2d 656, 660, *cert. denied*, ___ U.S. ___, 113 S.Ct. 423 (1992); *Strickler* v. *Commonwealth*, 241 Va. 482, 496, 404 S.E.2d 227, 237, *cert. denied*, 502 U.S. ___, 112 S.Ct. 386 (1991); *Quesinberry* v. *Commonwealth*, 241 Va. 364, 381, 402 S.E.2d 218, 228, *cert. denied*, 502 U.S. ___, 112 S.Ct. 113 (1991).

█ Murphy admitted that he hit James in the head with an iron pipe at least twice and that he also stabbed him. The autopsy report reveals that James suffered three stab wounds, one to the right front of his chest, one to the right front of his neck, and the other to his back. One wound penetrated his right lung, causing both of his lungs to bleed. His throat was slashed and his skull was fractured,

causing acute brain injury. The medical examiner concluded that the cause of death was the loss of blood and aspiration of blood stemming from the stab wound that penetrated the lung. The skull fracture and acute brain injury also contributed to James' death. We hold that the evidence was more than sufficient to support the trial court's finding that Murphy had committed a battery to the victim which was more than the minimum necessary to accomplish the act of murder.

## VI. Continuing Serious Threat to Society

Murphy contends that the trial court's finding that he constitutes a continuing serious threat to society is not supported by the evidence. Murphy argues that the trial court's finding was erroneous because he had no prior felony record; he had no prior history of violence; he expressed remorse; he cooperated with the police; he had been a model prisoner in the Virginia Beach Correctional Center; and he completed a high school equivalency degree program while incarcerated.

We disagree with Murphy. Code § 19.2-264.4(C) states, in relevant part:

> The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon . . . the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society.

Our review of the record reveals that Murphy initially planned to kill an individual, whom he had never met, for $5,000. After agreeing to commit the murder, he immediately began to plan the killing. Within hours after being approached to commit the murder, he borrowed a shotgun and a car, drove to a designated site, and hid in some bushes where he intended to shoot James. When the victim did not appear, he and his accomplices embarked upon another plan to kill the victim that night while he was asleep in his bed.

Murphy recruited others, including a juvenile, to assist him, and he agreed to share the $5,000 payment with them. He and his accomplices went to the victim's home, where they beat and stabbed him as he lay asleep. After committing this crime, they returned to

Hinojosa's residence where they sat and discussed what had occurred. Finally, when questioned by the police officers months after the murder was committed, Murphy showed no remorse. The facts and circumstances surrounding the planned murder for hire of James is sufficient to support the trial court's finding of future dangerousness.

## VII. Excessiveness and Disproportionality

■ Code § 17-110.1(C)(2) requires this Court to consider and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Murphy argues that his punishment is excessive or disproportionate because his accomplices did not receive a sentence of death.

Upon our prior determinations of excessiveness and disproportionality, we have rejected efforts by defendants to compare their sentences with those received by confederates. *Thomas* v. *Commonwealth*, 244 Va. 1, 26, 419 S.E.2d 606, 620, *cert. denied*, ___ U.S. ___, 113 S.Ct. 421 (1992); *King* v. *Commonwealth*, 243 Va. 353, 371, 416 S.E.2d 669, 679, *cert. denied*, ___ U.S. ___, 113 S.Ct. 417 (1992); *Evans* v. *Commonwealth*, 222 Va. 766, 780, 284 S.E.2d 816, 823 (1981), *cert. denied*, 455 U.S. 1038 (1982), *aff'd on remand*, 228 Va. 468, 323 S.E.2d 114 (1984), *cert. denied*, 471 U.S. 1025 (1985). We reject Murphy's effort to make a similar comparison here.

■ The test of proportionality that we apply is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes." *Stamper* v. *Commonwealth*, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), *cert. denied*, 445 U.S. 972 (1980); *accord Jenkins* v. *Commonwealth*, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992). Applying this test, we have examined the records of all capital murder cases previously reviewed by this Court where, as here, the death penalty was based upon murder for hire. *Stockton* v. *Commonwealth*, 241 Va. 192, 218, 402 S.E.2d 196, 211, *cert. denied*, 502 U.S. ___, 112 S.Ct 280 (1991); *Fisher* v. *Commonwealth*, 236 Va. 403, 374 S.E.2d 46 (1988), *cert. denied*, 490 U.S. 1028 (1989); *Clark* v. *Commonwealth*, 220 Va. 201, 257 S.E.2d 784 (1979), *cert. denied*, 444 U.S. 1049 (1980). Furthermore, we have examined the records of all capital murder cases previously reviewed by this Court where the death sentence was based upon

aggravated battery, vileness, or future dangerousness. Those cases are collected in *Chabrol* v. *Commonwealth*, 245 Va. 327, 334-35, 427 S.E.2d 374, 378 (1993), and *Mueller*, 244 Va. at 413-14, 422 S.E.2d at 397. Our examination of these decisions, as well as capital cases resulting in life imprisonment, reveals to us that Murphy's sentence of death is neither excessive nor disproportionate when compared to sentences generally imposed by sentencing bodies in this jurisdiction for crimes of a similar nature.

## VIII. Passion and Prejudice

■ Code § 17-110.1(C)(1) requires that we determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." Murphy asks this Court "to review the verbiage used by the [prosecutors] in their closing arguments, language which [he argues] was clearly aimed at inciting the passion of the [trial] Court and further aimed at mocking a defendant, who could not express his remorse in a manner satisfactory to the Commonwealth." To support his contention, Murphy relies upon the following statement the Commonwealth's Attorney made in closing argument at the sentencing hearing:

> The Commonwealth's position is that there is evidence of both predicates here. We have an individual, a victim, that this defendant doesn't even know. He killed a complete stranger; and depending on how you want to evaluate his testimony, he either did it for money or he did it as a favor at the time with an ultimate promise of money from a woman he had never met at the time he agreed to commit the crime for a man he had known only a very brief period of time. I think it was a matter of months was the testimony.
> He brings into this crime with him a juvenile and another young man that he knew. The court can evaluate his own demeanor. You heard [the police officer] testify about basically his lack of any sort of emotion or remorse with the exception of wanting to know who had turned him in. The court saw Mr. Murphy testify, and I would submit that [Murphy] more than corroborated [the police officer's] testimony concerning [Murphy's] emotional investment in this crime that he's committed.
> Is the crime vile such that the death penalty is appropriate in this case? It's vile for all kinds of reasons. It's vile from the

standpoint of the stranger. I think we can probably agree that murder for hire is one of the most vile crimes by its very nature that anyone could commit. We have no emotional confession, and we're not talking about jealousy. We're not even talking about greed so much. If you believe . . . Murphy's testimony today that he clearly got involved through Mr. Hinojosa based on a fairly brief acquaintanceship.

We have reviewed the Commonwealth's Attorney's argument in its entirety, and we simply find nothing to suggest that the language "was clearly aimed at" inciting the passion of the trial judge. More importantly, however, we find nothing in the record to suggest that the trial court imposed the sentence of death under the influence of passion, prejudice, or other arbitrary factors.

### IX. Request for Rehearing and Reconsideration of the Sentence of Death

Two days after the trial court fixed Murphy's punishment at death, his counsel forwarded a letter to the court requesting a rehearing. The basis of the request was that the Commonwealth had entered into a plea agreement with Hinojosa and he would receive a sentence of life imprisonment plus 20 years. Furthermore, Murphy's counsel indicated in the letter that James Hall and Aaron Turner would be allowed to plead guilty to less than capital murder charges and the Commonwealth would not seek the death penalty against them.

According to Murphy's counsel, he later received a telephone call from the circuit court clerk's office requesting him to appear in court on October 27, 1992 for a hearing to set an execution date. During the hearing, the court, Murphy's counsel, and the Commonwealth's Attorney discussed Murphy's request for a rehearing. After extensive colloquy between the court and counsel, the court stated:

Each defendant in this matter is different. Each defendant's degree of culpability in this tragedy is different. I seem sure you all know that this court anguished over the decision it made. The court after reading your letter, after hearing your argument, is of the opinion and was of the opinion last week and is still of the opinion that the punishment in this matter fits

the crime committed by Mr. Murphy for the reasons that I stated on the record.

I will not change the ruling. I think that basically without a formal motion to reconsider, we've had a motion to reconsider because I needed to know, Mr. Fasanaro [Murphy's counsel], what your reason was if it was anything other than your letter; so the court will not change its ruling.

The trial court treated Murphy's counsel's letter as a motion to reconsider and denied the motion. The trial court did not abuse its discretion by denying the request to reconsider and, thus, we hold that Murphy's assignment of error lacks merit.[*]

## X. Conclusion

Having reviewed the sentence of death, finding no error in the record, and perceiving no reason to commute the death sentence, we will affirm the judgment of the trial court.

*Affirmed.*

---

[*] Murphy contends, for the first time on appeal, that the trial court erred by refusing to grant him an evidentiary hearing on his motion. However, our review of the record reveals that Murphy did not request an evidentiary hearing in the trial court and, in fact, he specifically informed the court that he "would like an opportunity to present a comprehensive argument, no evidence, no facts, no witnesses." Thus, we do not consider this issue on appeal. Rule 5:25.