Present:   All the Justices

PERCY LAVAR WALTON
                              OPINION BY JUSTICE LEROY R. HASSELL, SR.
v.  Record Nos. 980010 and 980011  June 5, 1998

COMMONWEALTH OF VIRGINIA

        FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                    James F. Ingram, Judge

     In this appeal, we review the capital murder convictions,

the related felony convictions, and the death sentences

imposed upon Percy Lavar Walton for the murders of Elizabeth

W. Kendrick, Jessie E. Kendrick, and Archie D. Moore, Jr.

                        I.   PROCEEDINGS

     Walton, age 18 at the time of the offenses, pled guilty

to the following:  four charges of capital murder, three

charges of robbery, one charge of burglary, and six charges of

using a firearm in the commission of a felony.  Before

accepting the guilty pleas, the trial court questioned Walton

and made a determination that his guilty pleas were made

voluntarily, intelligently, and knowingly.  Walton and the

Commonwealth stipulated evidence that would have been adduced

had the case been tried.

     The trial court scheduled a separate sentencing hearing.

The defendant and the Commonwealth presented evidence, and the

trial court received the probation officer's report in the

manner prescribed by law.  After considering the evidence and

argument of counsel, the trial court stated orally that

Walton's conduct in each murder involved depravity of mind,

and his conduct associated with each capital offense indicated

that there is a probability that he will commit criminal acts

of violence that would constitute a continuing, serious threat

to society.  However, the trial court entered a sentencing

order which did not mention depravity of mind, but stated that

"there is a probability that the defendant would commit

criminal acts of violence that would constitute a continuing

serious threat to society."  The trial court fixed Walton's

punishment at three separate death sentences and imposed three

separate life sentences for each of the three robbery

convictions, ten years' imprisonment for the burglary

conviction, and three years' imprisonment for each of the six

firearms convictions.[*]

We have consolidated the automatic review of Walton's

death sentences with his appeal of right of his capital murder

convictions, Code §§ 17-110.1(A) and -110.1(F).  We have also

_____

[*] The trial court convicted Walton of three charges of
capital murder during the commission of robbery and one charge
of capital murder for the willful, deliberate, and
premeditated killing of more than one person within a three-
year period.  See Code §§ 18.2-31(4) and (8).  The trial court
imposed the three death sentences for the three convictions
for capital murder during the commission of robbery, and at
the time of sentencing, the trial court dismissed the
remaining capital murder conviction.  See Clagett v.

2

consolidated Walton's appeal to the Court of Appeals of Virginia from his non-capital convictions, and we have given his appeals priority on our docket. Code § 17-110.2.

## II. FACTS

### A. THE MURDERS OF ELIZABETH AND JESSIE KENDRICK

On November 16, 1996, Barbara K. Case, who was in Mississippi, made a telephone call to her parents, Elizabeth and Jessie Kendrick, who resided in Danville. Mrs. Case informed her parents during this telephone conversation that she planned to visit them during the approaching Thanksgiving holiday season. Mr. and Mrs. Kendrick agreed to meet their daughter at an airport in Greensboro, North Carolina, on November 25, 1996, three days before Thanksgiving, and return to Danville for the holidays. Mrs. Case made several attempts to reach her parents by telephone between November 16 and 25, 1996, but no one answered the telephone. Mrs. Case did not consider her parents' failure to answer the telephone unusual because her parents "traveled a lot."

When Mrs. Case arrived at the airport in Greensboro on November 25, 1996, her parents failed to meet her. She waited several hours, and then she became alarmed and disturbed. A woman at the airport gave Mrs. Case a ride to Danville.

---

Commonwealth, 252 Va. 79, 95-96, 472 S.E.2d 263, 273 (1996), cert. denied, ___ U.S. ___, 117 S.Ct. 972 (1997).

When Mrs. Case arrived at her parents' home in Danville, their townhouse was dark, and their car was missing.  Mrs. Case then went to her aunt's home, which is across the street from her parents' townhouse.  Mrs. Case and her aunt went to the Kendricks' residence, but no one answered the door.

Mrs. Case spent the night of November 25, 1996, with her aunt, and she contacted the Danville Police Department the next morning.  Several police officers arrived at Mr. and Mrs. Kendricks' townhouse and eventually entered the residence.  The police officers found the body of Mr. Kendrick, lying face down on a living room floor.  Mr. Kendrick's hands were "clasped, and above his head, clinched together."  The police found the body of Mrs. Kendrick on the floor in the den.  A portion of her body was covered with a sheet, and the upper portion of her body was wrapped in a "pinkish-orange material."  Mrs. Kendrick's shirt had "been rolled up, and then taped" and was loosely tied around her neck with a slipknot.  She had on undergarments below her waist, her pants had been cut from her body, and her body had been dragged across the floor.

Mr. Kendrick, who was 80 years old at the time of his murder, had been shot in the top of the head at close range.  He suffered a very large explosive type of wound where the bullet entered his head.  A "star-shaped appearance" and the

4

presence of soot on his head indicated that a muzzle of a gun was pressed tightly against the top of Mr. Kendrick's head when the gun was discharged and that gases emitted from the muzzle caused the skin around the entry point to "tear and rip." Mr. Kendrick also suffered superficial non-lethal cuts on the front of his neck and the palmar side of his left wrist.

Mrs. Kendrick, who was 81 years old at the time of her death, also suffered a tight contact gunshot wound to the top of her head. Her shirt, which was fashioned into a slipknot and tied around her neck, did not cause or contribute to her death.

The Kendricks were last seen alive on November 19, 1996, when Mrs. Kendrick, accompanied by her husband, went to a hospital in Danville. The police officers found the Kendricks' car a short distance behind their townhouse.

B. THE MURDER OF ARCHIE D. MOORE, JR.

On November 28, 1996, Thanksgiving Day, Roxanne Moore, who was in Greensboro, North Carolina, placed a telephone call to the Danville Police Department. Ms. Moore informed the police personnel that her brother, Archie Moore, who lived at the Cabin Lake Apartment Complex in Danville, was supposed to have met her at an airport in Greensboro on November 27, 1996, but he failed to appear. Ms. Moore informed the police

5

personnel that neither she nor her parents in North Carolina were able to contact Archie Moore by telephone at his Danville apartment.

Danville police officers entered Archie Moore's apartment around 8:00 a.m. on November 28. While searching the apartment, they found Archie Moore's body in a closet behind a suitcase. A plastic bag had been placed over Mr. Moore's head, and his feet were "propped up" against the closet wall. There was a strong odor of cologne in the closet and on the victim's body. The cause of Mr. Moore's death was a gunshot wound to his head, immediately above his left eye. The bullet found on the floor in his apartment.

Shortly after Moore's body was discovered, two witnesses informed the Danville Police Department that they had recently observed Walton driving Moore's Ford Mustang automobile. Other witnesses had also observed Walton walking on a sidewalk from the area near Mr. and Mrs. Kendricks' townhouse toward Cabin Lake on several occasions between November 19 and November 26, 1996.

Subsequently, the police found Moore's Mustang, "parked right across the street from [Walton's] house." Walton lived in a condominium with his parents a short distance from Moore's apartment and the Kendricks' townhouse.

Lieutenant Kenneth D. Fitzgerald, a Danville police detective, went to Walton's home, spoke with Walton, and asked him if he knew Moore. Walton denied that he knew Moore, and he denied "ever [having] been in Archie Moore's car." Walton agreed to go to the police department for further questioning. Detective Fitzgerald left Walton's home and later, Walton, accompanied by his father, went to the police department.

The police obtained a search warrant for Walton's residence. During a search of Walton's bedroom, police personnel found a silver metal box inside one of Walton's boots. The box contained a diploma and an "ATM card," both bearing Archie Moore's name. The police also found a set of car keys; one key fit Moore's Mustang and two other keys fit locks on the doors of Moore's apartment. The police also found a ring, which contained a very distinctive letter "A", which was similar to a ring that Moore had been wearing before his death.

When the police officers searched Moore's car, they found a box containing two dozen .32-caliber bullets as well as keys that fit locks in the Kendricks' car and home. The police officers also found a plastic bag which contained a "plastic sleeve" from a wallet. Jessie Kendrick's driver's license and his "Knights of Columbus" card were inside the "plastic sleeve." Walton's fingerprints were identified on the

"plastic sleeve." Walton's fingerprints were also found on numerous items at various locations in Moore's apartment and car.

When the police searched the Kendricks' car, they found a shotgun that had been stolen from the Kendricks' townhouse. Walton's fingerprint was found on the shotgun. A knife, found in a toolbox in the trunk of the Kendricks' car, contained blood which matched Mr. Kendrick's DNA.

The police officers recovered two .32-caliber bullet cartridges that had been partially submerged near the shoreline of Cabin Lake. The lake was drained, and the police officers recovered a .32-caliber pistol that Mr. Kendrick had purchased in 1970. Ballistic tests conducted on a bullet that had been removed from Mr. Kendrick's head revealed that the bullet "matched" the .32-caliber pistol recovered from the lake and was consistent with the bullets that had killed Moore and Mrs. Kendrick. The pistol contained four bullets and two spent cartridges. The lead contained in the bullets found in Moore's car, the bullets recovered from the heads of the victims, and the bullets in the revolver originated from the same manufacturing source.

While in jail awaiting trial for the capital murder charges and related offenses, Walton admitted to several inmates that "he had killed three people at Cabin Lake."

Walton also described the graphic details of the murders at length to Lacy H. Johnson, with whom Walton shared a cell in the Danville City Jail.

### III. ISSUES WAIVED

Walton argues that the trial court "erred in finding the stipulated evidence at the guilt phase sufficient to convict [him], even on his pleas of guilty, in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution." This assignment of error seeks to raise issues that Walton waived by the entry of his guilty pleas and, thus, these issues are not cognizable in this appeal. We have repeatedly held that a defendant who appeals a judgment of death may not complain of any non-jurisdictional defects that occurred prior to his guilty plea. Beck v. Commonwealth, 253 Va. 373, 380, 484 S.E.2d 898, 903, cert. denied, ___ U.S. ___, 118 S.Ct. 608 (1997); Murphy v. Commonwealth, 246 Va. 136, 141, 431 S.E.2d 48, 51, cert. denied, 510 U.S. 928 (1993); Savino v. Commonwealth, 239 Va. 534, 539, 391 S.E.2d 276, 278, cert. denied, 498 U.S. 882 (1990); Stout v. Commonwealth, 237 Va. 126, 131-32, 376 S.E.2d 288, 291, cert. denied, 492 U.S. 925 (1989); Beaver v. Commonwealth, 232 Va. 521, 526, 352 S.E.2d 342, 345, cert. denied, 483 U.S. 1033 (1987); Peyton v. King, 210 Va. 194, 196-97, 169 S.E.2d 569, 571 (1969).

### IV. ADMISSIBILITY OF EVIDENCE DURING THE SENTENCING PHASE

Walton argues that the trial court erred by admitting "the photographs of the victims as they were discovered at the crime scenes and of their autopsies over defense objections that such photographs were so prejudicial and inflammatory as to outweigh any probative value in violation of Walton's due process rights under the Fifth and Fourteenth Amendments of the United States Constitution." We find no merit in Walton's argument.

We have repeatedly held that the admission of photographs in evidence rests within the sound discretion of the trial court. Goins v. Commonwealth, 251 Va. 442, 459, 470 S.E.2d 114, 126, cert. denied, 519 U.S. ___, 117 S.Ct. 222 (1996); Quesinberry v. Commonwealth, 241 Va. 364, 378, 402 S.E.2d 218, 226, cert. denied, 502 U.S. 834 (1991). Photographs of a victim are admissible to show motive, intent, method, malice, premeditation, and the atrociousness of the crime. Goins, 251 Va. at 459, 470 S.E.2d at 126. Photographs which accurately depict the crime scene are not rendered inadmissible simply because they are gruesome or shocking. Goins, 251 Va. at 459, 470 S.E.2d at 126; Gray v. Commonwealth, 233 Va. 313, 343, 356 S.E.2d 157, 173, cert. denied, 484 U.S. 873 (1987).

We have examined the photographs, and we find no abuse of discretion by the trial court. Furthermore, the defendant's conclusional assertion that the admission of these photographs

somehow violates his due process rights under the Fifth and Fourteenth Amendments to the United Constitution is without merit.

## V. CONTINUING SERIOUS THREAT TO SOCIETY

Walton argues that the trial court erred by holding that "the Commonwealth's evidence [was] sufficient to prove, beyond a reasonable doubt, the statutory aggravator of future dangerousness in violation of Walton's rights under the Fifth and Fourteenth Amendments of the United States Constitution, because . . . Walton had no prior history of significant violent offenses." Continuing, Walton says that his prior criminal history does not demonstrate a propensity for violence, that the circumstances surrounding the crimes that are the subject of this appeal do not show a propensity for violence, and that the credible evidence of record in this case does not prove beyond a reasonable doubt that he poses a threat of future danger. We disagree with Walton's assertions.

Code § 19.2-264.4(C) states, in relevant part:

> "The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society . . . ."

11

The evidence of record supports the trial court's finding beyond a reasonable doubt that there is a probability based upon both Walton's prior history and the circumstances surrounding the commission of the present offenses that he would constitute a continuing serious threat to society.  The evidence of record reveals that Walton killed an 80-year-old man and an 81-year-old woman by shooting both victims in the head.  Walton killed Mr. Kendrick by placing the muzzle of the pistol tightly against the top of the victim's head and then discharging the weapon.  Walton later shot Moore in the head and killed him simply because he wanted to drive Moore's car.

When Walton was incarcerated awaiting trial for the capital offenses, he described the murders to several inmates, including Lacy Johnson, to whom he related the following facts.  Walton had "broken into" the Kendricks' residence when the Kendricks unexpectedly arrived home.  Walton forced Mr. Kendrick to lie face down on the floor.  Walton then turned to Mrs. Kendrick, who "dropped down to [her] knees," and "started begging and crying."  Walton told her to "shut up," and then he "shot her in the top of the head."  Walton then "looked over at Mr. Kendrick, who was laying there crying, and [Walton] started laughing at him, and he walked over to him. As [Walton] walked over to [Mr. Kendrick], [Walton] tried to

12

cut his throat, with a knife.  [Walton] said that didn't work, so he leaned down, and shot him in the top of the head." Walton told Johnson that Walton had seen the Kendricks before, but "they didn't really matter to him . . . they won't nobody."

Walton also related the following facts to Johnson about Moore's murder.  Walton went to Moore's apartment and asked to use his telephone.  Moore permitted him to do so, and Walton called his own home telephone number.  Walton then returned to his home and used a telephone feature to acquire Moore's telephone number.  He later returned to Moore's residence and asked to use the phone again.  Moore hesitated by looking at Walton, who then smiled.  In response, Moore invited Walton in to use his telephone.  When Moore handed to Walton a portable telephone, Walton, using his pistol, fired a shot at Moore, which missed.  Walton fired a second shot which "hit [Moore] over the eye."  Then, Walton demonstrated to Johnson how he had killed Moore by "dropp[ing] to the floor . . . laughing."

According to Johnson, Walton said:

"[A]fter he did the first killing, he knew what he wanted to do.  And then he said that he wanted to be famous, for killing a bunch of people, and that's why he wanted a high powered enough gun, where he can kill everybody over in Cabin Lake, and he wanted to catch everybody, like at the swimming pool one day, and just gun 'em all down. . . .  [H]e wanted to be famous . . . especially, in Danville, for killing a bunch of folks."

13

We hold that the facts and circumstances surrounding these murders are sufficient to support the trial court's finding of future dangerousness. Moreover, Walton's criminal history also supports the trial court's finding of future dangerousness. Walton had been convicted of statutory burglary and grand larceny. He had also been convicted of resisting arrest and assault and battery on a police officer. As a juvenile, Walton was convicted of two different offenses of possession of a firearm and one charge of assault and battery.

## VI. DEPRAVITY OF MIND

Walton argues that "[i]t was error for the trial court to find the Commonwealth's evidence sufficient to prove, beyond a reasonable doubt, the statutory aggravator of vileness, in violation of Walton's rights under the Fifth and Fourteenth Amendments of the United States Constitution because the facts of the offenses do not establish torture, depravity of mind or aggravated battery to the victims." We will not consider this assignment of error.

As we have already mentioned in Section I of this opinion, the trial court stated orally that each of the three murders Walton committed demonstrated Walton's "depravity of mind." However, the trial court's sentencing order did not

14

sentence Walton to death on that basis. Rather, the trial court stated in its sentencing order that there is a probability that Walton would commit criminal acts of violence that would constitute a continuing serious threat to society.

We have stated that "[i]t is the firmly established law of this Commonwealth that a trial court speaks only through its written orders." Davis v. Mullins, 251 Va. 141, 148, 466 S.E.2d 90, 94 (1996). Accord Robertson v. Superintendent of the Wise Correctional Unit, 248 Va. 232, 235 n.*, 445 S.E.2d 116, 117 n.* (1994); Town of Front Royal v. Industrial Park, 248 Va. 581, 586, 449 S.E.2d 794, 797 (1994); Martin v. Coleman, 234 Va. 509, 510 n.1, 362 S.E.2d 732, 733 n.1 (1987); Hill v. Hill, 227 Va. 569, 578, 318 S.E.2d 292, 297 (1984); Nash v. Jewell, 227 Va. 230, 237, 315 S.E.2d 825, 829 (1984); Walker v. Commonwealth, 225 Va. 5, 8, 301 S.E.2d 28, 29 (1983); Cunningham v. Smith, 205 Va. 205, 208, 135 S.E.2d 770, 773 (1964). Thus, the trial court's sentence of death was not predicated upon the statutory aggravator of vileness.

After oral argument before this Court, the Commonwealth forwarded a letter to the Clerk of this Court and a document which purported to be a "nunc pro tunc sentencing order." The purported order, dated April 20, 1998, and signed by the trial court, contains a finding that the sentences of death were also imposed upon the defendant because in committing the

15

capital murders, his acts were "outrageously or wantonly vile, horrible or inhumane in that [the acts] involved depravity of mind."

We do not consider this purported order because the trial court was divested of jurisdiction once the defendant filed his notices of appeal. We have stated that the "orderly administration of justice demands that when an appellate court acquires jurisdiction over the parties involved in litigation and the subject matter of their controversy, the jurisdiction of the trial court from which the appeal was taken must cease." Greene v. Greene, 223 Va. 210, 212, 288 S.E.2d 447, 448 (1982).

VII.  PASSION AND PREJUDICE

Code § 17-110.1(C)(1) requires that we determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor."  Walton argues that the trial court's failure to impose life sentences instead of the death penalties "demonstrates that [the court] was swept away on a tide of passion, prejudice and other arbitrary factors."  We have reviewed the evidence of record, and we reject Walton's contentions because they are without merit.  Our review of the record indicates that the trial court gave thoughtful and careful consideration to all the evidence, and we find nothing

in the record to suggest that the trial court imposed the sentences of death under the influence of passion, prejudice, or other arbitrary factors.

VIII.  EXCESSIVENESS AND DISPROPORTIONALITY

Code § 17-110.1(C)(2) requires this Court to consider and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Walton argues that a review of the record of all comparable cases throughout the Commonwealth, including those that resulted in non-capital dispositions, reveal that his death sentences are disproportionate.  We disagree.

The test of proportionality that we apply is whether "juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes."  Murphy, 246 Va. at 145, 431 S.E.2d at 54 (quoting Stamper v. Commonwealth, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), cert. denied, 445 U.S. 972 (1980)); Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993).

Our comparison of the record in this case with the records in other capital cases, including capital cases in which life sentences were imposed, fails to indicate that the death penalties imposed here are "excessive or

17

disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  Code § 17-110.1(C)(2).

We have given particular consideration to other capital cases in which robbery or attempted robbery was the underlying felony and the death penalty was based only on the future dangerousness predicate.  Such cases were compiled in Yeatts v. Commonwealth, 242 Va. 121, 143, 410 S.E.2d 254, 267-68 (1991), cert. denied, 503 U.S. 946 (1992), and supplemented in Jackson v. Commonwealth, 255 Va. ___, ___, ___ S.E.2d ___, ___ (1998), Chichester v. Commonwealth, 248 Va. 311, 332-33, 448 S.E.2d 638, 652 (1994), cert. denied, 513 U.S. 1166 (1995), and Roach v. Commonwealth, 251 Va. 324, 351, 468 S.E.2d 98, 113, cert. denied, 519 U.S. ___, 117 S.Ct. 365 (1996).

## IX.  CONCLUSION

Having reviewed the sentences of death and related convictions, finding no reversible error in the record, and perceiving no reason to commute the death sentences, we will affirm the judgment of the trial court.

Affirmed.

18