Present: All the Justices

JAMES EDWARD REID,
a/k/a JAMES EDWARD REED

v. Record No. 981020    OPINION BY JUSTICE CYNTHIA D. KINSER
                                        November 6, 1998
COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
Ray W. Grubbs, Judge

On December 3, 1997, James Edward Reid pled guilty to

three charges: (1) capital murder of Annie V. Lester during

the commission of attempted rape and/or attempted robbery

in violation of Code § 18.2-31; (2) attempted rape in

violation of Code § 18.2-67.5; and (3) attempted robbery in

violation of Code § 18.2-58.[1]  After accepting the pleas and

hearing evidence about the commission of the offenses, the

trial court found Reid guilty as charged.

During the subsequent sentencing proceedings, the

trial court heard evidence from both sides and received a

pre-sentence report.[2]  The trial court then sentenced Reid

to death for the capital murder conviction and imposed two

ten-year sentences for the attempted rape and attempted

robbery convictions.  In imposing the death penalty

---

[1] Reid entered the guilty pleas pursuant to <u>North
Carolina v. Alford</u>, 400 U.S. 25 (1973).

[2] The trial court conducted the first part of the
penalty phase hearing on December 3, 1997, immediately

pursuant to Code §§ 19.2-264.2 and -264.4(C), the trial court found that Reid's conduct in committing capital murder was "outrageously vile, horrible and inhuman in that it involved such aggravated battery to the victim, that is . . . qualitatively and quantitatively . . . more culpable than the minimum necessary to accomplish an act of murder."

On appeal, Reid contends that the trial court disregarded certain mitigating evidence and therefore erred in imposing the death penalty.[3] Upon consideration of the record, briefs, and argument of counsel, we find no error in the judgment of the trial court. Further, upon conducting our review pursuant to Code § 17-110.1(C), we conclude that the sentence of death in this case was not imposed "under the influence of passion, prejudice or any other arbitrary factor" and is not excessive or disproportionate. Accordingly, we will affirm the judgment of the trial court.

FACTS

---

after finding Reid guilty. The court reconvened the hearing on February 20, 1998.

[3] Reid is before this Court for automatic review of his death sentence under Code § 17-110.1.

Code § 17-110.1 was repealed and replaced by § 17.1-313, effective October 1, 1998. Because the parties briefed and argued this case under the provisions of § 17-110.1, and because the relevant provisions remain unchanged in § 17.1-313, we will cite to § 17-110.1 in this opinion.

"Since the Commonwealth prevailed in the trial court, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth." Graham v. Commonwealth, 250 Va. 79, 81, 459 S.E.2d 97, 98, cert. denied, 516 U.S. 997 (1995) (citing Swann v. Commonwealth, 247 Va. 222, 225, 441 S.E.2d 195, 198, cert. denied, 513 U.S. 889 (1994)).

In the afternoon on October 12, 1996, Lester's cousin went to Lester's house, and after finding the front screen door open, entered the house, discovered Lester's body on the floor at the end of a bed, and observed debris all over the bedroom floor. The cousin left and went to a relative's house to call for emergency help, but then returned to Lester's home and was there when the police arrived.

Before disturbing the crime scene, the police made a video recording of the inside of Lester's house. The tape was admitted into evidence, and Officer Tommy Lawson narrated what was being seen as the trial court watched it. Blood was present throughout Lester's home on such items as the kitchen floor, the back door and back door trim, the refrigerator, a can of milk, a wig lying on the kitchen floor, the door leading from the kitchen into a television room, scissors lying on a chair in the television room, the

bed and headboard in the bedroom where Lester's body was found, the cord of an electric heating pad that was under Lester's head, and the seat of a chair beside her body. Several items of Lester's clothing had blood on them, including a sweater, a slip, and a bra that was still fastened in the back but that "[was] broken in some fashion in the front." The bedroom was in complete disarray with dresser drawers on the floor and bed and clothing strewn all around. A wine bottle was sitting on the floor at the foot of the bed.

William Massello, the Assistant Chief Medical Examiner for Western Virginia, performed an autopsy on Lester. He described Lester as an elderly, slender, and "somewhat emaciated" female. During the autopsy, Massello observed 14 stab wounds to the front of Lester's neck and three stab wounds to her chin, one of which went into the jugular vein on the left side of her neck. There were also five stab wounds to the front of Lester's chest. Massello testified that several of these wounds went through the chest wall into Lester's left lung and into her heart. In Massello's opinion, the most rapidly lethal wounds were four of the stab wounds to the chest, which caused bleeding into the chest cavity and, in turn, caused Lester to die rapidly. According to Massello, all the stab wounds had a Z-shaped

4

or H-shaped configuration consistent with injuries caused by two blades superimposed on one another or scissors blades.

In addition to the stab wounds, Massello observed multiple lacerations and bruises on Lester's body.  Some of these injuries on the top of Lester's head and face were caused either by Lester's head being struck with a blunt instrument, or by her head striking another object such as a door or wall.  Lester had lacerations on the right and left sides of her face and linear crush marks on the right side of her face.[4]  Finally, Lester sustained a fracture of the hyoid bone,[5] resulting either from the force of strangulation or from being struck in that area with an object.

The evidence linking Reid to the commission of these crimes consists, in part, of testimony from witnesses who saw Reid at or in the vicinity of Lester's house on the day of her murder.  Around 10:30 a.m. on October 12, Reid

---

[4] Massello opined that the can of milk found in Lester's kitchen was the kind of instrument that could have caused some of the injuries to Lester's head.

[5] Hyoid bone is defined as "a bone or complex of bones situated at the base of the tongue and developed from the second and third visceral arches, supporting the tongue and its muscles . . . ."  Webster's Third New International Dictionary 1111 (1993).

secured a ride to Lester's house with Haywood Alexander and Robert Smith.  Reid's stated purpose for going to Lester's house was to do some work there.[6]  En route to Lester's home, Reid asked Alexander and Smith to stop at a store where Reid purchased a bottle of wine.  They then proceeded to Lester's house, and upon arriving there, Reid exited the vehicle and walked around to the back of the house with his bottle of wine.  Alexander and Smith then left.

Around 4:30 p.m. on that same day, George Eanes, who worked at Eanes Body Shop located across the street from Lester's house, observed Reid walking across the street from the direction of Lester's house.  Reid approached Eanes and asked for a ride.  Eanes explained to Reid that he was working on his vehicle and could not give him a ride at that time.  When asked at the trial to describe Reid's appearance, Eanes stated that "[Reid] had a lot of blood on him and he was staggering."[7]  After seeing the blood on Reid's clothing, Eanes asked Reid how he got in that

---

[6] Reid apparently had performed odd jobs for Lester on previous occasions and enjoyed discussing the Bible with her.

[7] Reid had blood on his sleeve, shoes, pants, and front of his coat.

condition.  According to Eanes, Reid responded by referring to a former lover and stating that "he did it for love."

George W. Eanes, father of George Eanes, also saw Reid at the body shop and confirmed that Reid appeared to have been in a fight because he had blood all over him.  Eanes' father stated that Reid smelled like a "brewery" but that he, nevertheless, agreed to give Reid a ride home.  During that drive, Reid explained to Eanes' father that some person had given him some drugs and that they had gotten into an argument or fight.

The results of forensic tests, fingerprint analyses, and handwriting comparisons also place Reid at Lester's house on the day in question.  Forensic tests established that Reid's DNA matched a stain abstracted from a cigarette butt found in Lester's home.  A blood stain abstracted from the same cigarette butt was consistent with the DNA profile of Lester and Reid.  In addition, the forensic scientist who conducted these tests testified that Lester's DNA was consistent with blood recovered from Reid's jacket. Finally, two of Reid's fingerprints were identified in blood found on the handset of a rotary telephone in Lester's bedroom, and Reid's handwriting was found on some papers recovered in Lester's house.

The Commonwealth presented all the foregoing evidence during the guilt phase of Reid's trial but also relied upon it during the sentencing phase. In addition, the Commonwealth presented testimony from Robert D. O'Neal, a probation officer. O'Neal interviewed Reid while preparing the pre-sentence report. During that interview, Reid stated to O'Neal that he did not remember anything about the incident. According to O'Neal, Reid believes that he "blacked out" because he remembers being at Lester's house prior to the offense but does not recall anything that transpired from that point until he awoke at home and found blood on his clothing.

In mitigation, Reid presented evidence from three medical experts: Dr. Pogos H. Voskanian, a forensic psychiatrist; Dr. Stephen Herrick, a forensic psychologist; and Dr. Randy Thomas, a clinical psychologist. Each of these witnesses discussed Reid's medical and psychiatric conditions that, in their opinion, affect Reid's ability to form the intent to commit a crime and that have caused Reid to experience "blackout" periods during which he is basically out of control and engages in disorganized, aggressive behavior toward an unlikely target.

Three factors were significant to these medical experts in formulating their respective opinions. First,

Reid suffered a major head trauma as a result of an automobile accident in 1968 and was in a coma for at least five days.  The damaged area of Reid's brain was the left temporal lobe and part of the frontal lobe, which affects an individual's personality and ability to control impulses.  Thus, Reid does not resist acting on his impulses.  Second, Reid developed a seizure disorder shortly after the head injury.  According to Dr. Voskanian, Reid's head trauma triggered the seizure disorder.  Because Reid has been noncompliant with taking his medication to control the seizures, he has experienced repeated seizures that have, in turn, progressively caused more damage to his brain.  Finally, Reid has a family history of alcoholism, has abused alcohol since age 15, and has had numerous admissions to both psychiatric hospitals and alcohol abuse rehabilitation centers.  Because of Reid's brain injury, he is more vulnerable to the effects of alcohol and likely to become intoxicated more quickly than another person.  In addition, Reid is a binge drinker, meaning that he has not built up a tolerance for the effects of alcohol.

Dr. Voskanian opined that Reid experiences "blackout" episodes when he is intoxicated.  During these episodes, Reid may not remember what he did five minutes ago but would retain his memory for established information such as

9

his name and residence.  Dr. Voskanian further opined that Reid was in "an impaired state of consciousness" when he left Lester's house because Reid said things that could not be understood and did nothing to conceal his bloody clothing.

In summary, Dr. Voskanian stated that Reid's head trauma, seizure disorder, long history of drinking, and serious medical conditions,[8] could "have a significant impact on Mr. Reid's ability to think clearly, or perform intentional acts."  Dr. Voskanian also opined that these conditions could cause violent outbursts that Reid would not remember if he were intoxicated.  However, all three medical experts believed that Reid would not be susceptible to these violent outbursts if he were in a structured setting where he would not have access to alcohol.

Some of Reid's family members also testified that Reid is a different person when he is intoxicated.  His ex-wife, sister, and mother described Reid as a kind and considerate person when he is sober, but acknowledged that Reid has violent episodes during periods of intoxication.  They also confirmed that Reid cannot remember what he does when he is

---

[8] Reid underwent cardiac by-pass surgery.  Several years after the surgery, Reid again had chest pains and suffered a myocardial infarction.  Reid has also been diagnosed with lung cancer.

intoxicated.  For example, his ex-wife testified that Reid

once stabbed her when he was intoxicated but that he had no

recollection of the incident the next morning.

ANALYSIS

Under Code § 19.2-264.4(B), facts in mitigation that a

trial court can consider in deciding whether to impose a

sentence of death or life imprisonment may include the

following:

> (ii) the capital felony was committed while the
> defendant was under the influence of extreme mental or
> emotional disturbance, . . . [and] (iv) at the time of
> the commission of the capital felony, the capacity of
> the defendant to appreciate the criminality of his
> conduct or to conform his conduct to the requirements
> of law was significantly impaired.

On appeal, Reid argues that the trial court erred by not

considering evidence establishing these mitigating factors.

Specifically, Reid contends that the court failed to

address evidence showing Reid's lack of planning or

premeditation, lack of memory of the incident, and behavior

subsequent to the commission of the crimes.  Reid also

asserts that the trial court failed to consider the

uncontradicted medical testimony regarding his medical and

psychiatric impairments.  According to Reid, this evidence

demonstrates not only that he was unaware of what he was

doing at Lester's home on the day in question but also that

he cannot now remember anything about the incident.  Thus,

11

Reid argues that his conduct in committing the murder of Lester cannot be deemed "vile" and that the trial court, therefore, erred by imposing a sentence of death based on the "vileness" factor.

Reid's arguments can be distilled into a single complaint that the trial court must not have considered his mitigating evidence since the court imposed the death penalty. Reid asserts that, since his evidence was uncontradicted and is not inherently improbable or inconsistent, it had to be accepted as true. Once that evidence was accepted as true, Reid contends that it negated the trial court's finding of "vileness." In other words, Reid asserts that the trial court should have given controlling weight to his mitigating evidence. We do not agree.

Following a 15-minute recess after the close of the evidence in the penalty phase, the trial court announced its sentencing decision and, in doing so, stated, "The Court has the duty to consider all such evidence, both favorable to you and unfavorable presented relative to this hearing in ascertaining whether the crime of which you have been convicted is so atrocious that the death sentence should be imposed." Thus, we conclude that the trial court did, in fact, consider Reid's mitigating evidence.

12

We have addressed this type of complaint on at least two previous occasions. First, in Correll v. Commonwealth, 232 Va. 454, 468, 352 S.E.2d 352, 360, cert. denied, 482 U.S. 931 (1987), the defendant argued, as does Reid, that the mitigating evidence was of such weight that the court could not have considered it and still sentenced him to death. The mitigating evidence in that case established that Correll had a troubled childhood and unfortunate home situation. Taking the view that such evidence tended to explain, but did not excuse, Correll's commission of the capital murder, we concluded that "it did not require as a matter of law that the death penalty not be imposed." Id. We further stated that the fact-finder has a duty to consider mitigating evidence along with other evidence in determining the appropriate sentence but that the fact-finder is "not required to give controlling effect to the mitigating evidence." Id. at 468-469, 352 S.E.2d at 360.

Similarly, in Murphy v. Commonwealth, 246 Va. 136, 142, 431 S.E.2d 48, 52, cert. denied, 510 U.S. 928 (1993), we addressed the defendant's argument that the trial court had failed to consider fully the evidence in mitigation of the imposition of the death penalty. As in the present case, the trial court in Murphy stated on the record that it had considered all the evidence. Relying on our

decision in Correll, we concluded that the trial court had "maturely, carefully, and calmly deliberated the full range of issues." Id.

As in Correll and Murphy, the evidence upon which Reid relies is mitigating in that it shows "extenuating circumstances tending to explain, but not excuse, his commission of the crime." Correll, 232 Va. at 468, 352 S.E.2d at 360 (quoting Coppola v. Commonwealth, 220 Va. 243, 253, 257 S.E.2d 797, 804 (1979), cert. denied, 444 U.S. 1103 (1980)). The trial court was not, however, required to give controlling weight to the mitigating evidence. Id. at 469, 352 S.E.2d at 360.

Moreover, Reid's mitigating evidence does not, as a matter of law, negate the trial court's finding of "vileness." Reid stabbed Lester 22 times and inflicted other wounds on her head, face, hyoid bone, and arms. According to the medical examiner, four of the five stab wounds to Lester's chest were fatal. From the presence of blood throughout Lester's house, it can be inferred that Reid carried or dragged her body from the kitchen into the bedroom. At some point, he also removed her clothes and ransacked her bedroom.

Reid's medical and psychiatric impairments, his periods of "blackout," his lack of memory regarding the

14

acts he committed at Lester's home, and his behavior subsequent to the incident when he made no attempt to hide either his presence at Lester's home or his blood-covered clothing do not change the fact that the commission of this crime was "outrageously . . . vile, horrible or inhuman, in that it involved . . . aggravated battery" to Lester.  Code §§ 19.2-264.2 and -264.4(C).  It was "qualitatively and quantitatively . . . more culpable than the minimum necessary to accomplish an act of murder."  Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979). We have never held that the "vileness" factor under Code §§ 19.2-264.2 and –264.4(C) includes a requirement that a defendant's mental state embrace the intent to commit an "outrageously or wantonly vile" murder, and we decline to do so now.  "The number or nature of the batteries inflicted upon the victim is the essence of the test whether the defendant's conduct 'was outrageously or wantonly vile, horrible or inhuman in that it involved . . . an aggravated battery.'"  Boggs v. Commonwealth, 229 Va. 501, 521, 331 S.E.2d 407, 421 (1985), cert. denied, 475 U.S. 1031 (1986) (quoting Code § 19.2-264.2).

PREJUDICE AND PROPORTIONALITY REVIEW
OF DEATH SENTENCE

15

Pursuant to Code § 17-110.1(C)(1), we are required to determine whether the death sentence in this case was imposed under the influence of passion, prejudice, or other arbitrary factors. Upon careful examination of the record, we find no evidence that any such factor was present or influenced the trial court's sentencing decision. Indeed, Reid has not asserted that the imposition of the death penalty in this case was the result of passion or prejudice.

We must also determine whether the sentence of death in this case is "excessive or disproportionate to the penalty imposed in similar cases." Code § 17-110.1(C)(2). In conducting this review, we have inspected the records of all capital cases presented to this Court including those cases in which the trial court imposed a life sentence instead of the death penalty. In complying with the directive in Code § 17-110.1(C)(2) to compare "similar" cases, we have given particular attention to those cases in which the underlying felony predicates and the facts and circumstances surrounding the commission of the crimes were the same as those in this case. We have also focused on cases in which the death penalty was imposed solely on the basis of the "vileness" factor. However, our proportionality review does not require that a given

16

capital murder case "equal in horror the worst possible scenario yet encountered."  Turner v. Commonwealth, 234 Va. 543, 556, 364 S.E.2d 483, 490, cert. denied, 486 U.S. 1017 (1988).

Based on this review, the Court concludes that Reid's sentence of death is not excessive or disproportionate to sentences generally imposed in this Commonwealth for capital murders comparable to Reid's murder of Lester. See, e.g. Fry v. Commonwealth, 250 Va. 413, 463 S.E.2d 433 (1995), cert. denied, 517 U.S. 1110 (1996) (11 gunshot wounds to victim's head, chest, and abdomen; victim dragged down dirt road while alive); Barnes v. Commonwealth, 234 Va. 130, 360 S.E.2d 196 (1987), cert. denied, 484 U.S. 1036 (1988) (multiple gunshot wounds); Washington v. Commonwealth, 228 Va. 535, 323 S.E.2d 577 (1984), cert. denied, 471 U.S. 1111 (1985) (38 stab wounds to victim); Boggs, 229 Va. 501, 331 S.E.2d 407 (victim stabbed in two places and struck on head and neck multiple times).  As already stated, Reid inflicted 22 stab wounds upon the victim, four of which were lethal wounds to Lester's chest, in addition to multiple other injuries.  Reid committed these acts while carrying or dragging Lester's body through her house and removing her clothing.

17

For these reasons, we find no error in the imposition of the sentence of death, nor do we perceive any reason to commute the death sentence.  Therefore, we will affirm the judgment of the trial court.

<u>Affirmed.</u>