COURT OF APPEALS OF VIRGINIA

Present: Judges Decker, Malveaux and Senior Judge Annunziata

ROBYN SANETTE MUSOLFF

MEMORANDUM OPINION*
PER CURIAM
SEPTEMBER 25, 2018

v.     Record No. 0521-18-3

ROANOKE COUNTY DEPARTMENT
 OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF ROANOKE COUNTY
Charles N. Dorsey, Judge

(James P. Cargill, on brief), for appellant. Appellant submitting on brief.

(Rachel W. Lower, Assistant County Attorney; Marta J. Anderson, Guardian *ad litem* for the minor children, on brief), for appellee. Appellee and Guardian *ad litem* submitting on brief.

Robyn Sanette Musolff (mother) appeals the order terminating her parental rights to her children. Mother argues that the circuit court erred in (1) finding that the evidence was sufficient to prove that the termination of her parental rights was in in the best interests of the children; (2) finding that the evidence was sufficient to terminate her parental rights pursuant to Code § 16.1-283(C)(2); (3) finding that the evidence was sufficient to prove that the foster care goal of adoption was in the best interests of the children; (4) finding that the evidence was sufficient to prove that the Roanoke County Department of Social Services (the Department) investigated either placement of the children with relatives or that the Department was unable to place the children with relatives; and (5) not making a finding that the Department had investigated either placement of the children with relatives or that the Department was unable to place the children with relatives.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Mother further argues that the lower courts did not have jurisdiction over these proceedings under Code §§ 16.1-262 and -241 because (1) the affidavit filed in support of the preliminary child protective order "was not based on facts personally known by the Affiant" as required by Code § 16.1-262(C), and (2) the initial petition for the preliminary protective order was not signed by an attorney licensed to practice law in Virginia. Upon reviewing the record and briefs of the parties, we conclude that the circuit court did not err. Accordingly, we affirm the decision of the circuit court.

## BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

In September 2014, Jacques Adam Beim (father) and mother were living in a hotel room with K.B. and J.B., who were two years old and four years old at the time, and mother's child, L.M., who was nine years old.[1] The Department received a complaint regarding the children's lack of supervision and lack of hygiene. On September 26, 2014, Robin Freeman, a child protective services worker with the Department, made an unannounced visit to the hotel room. When Freeman arrived, she encountered J.B. and L.M. in the parking lot, unsupervised. J.B. wore only a "sagging" diaper and did not speak. Freeman asked L.M. to get her mother, who was in another hotel room. When mother met Freeman, she had K.B. with her, and like J.B., K.B. did not have on any clothes, except for a "sagging" diaper. Freeman observed mother and father's hotel room, which was "very cluttered," "unorganized," and had a "strong smell of body odor." Father was at work when Freeman visited on September 26, 2014, and she did not speak with him.

---

[1] Father is the biological father to J.B. and K.B., but not L.M.

After forty-five days, the Department filed petitions for child protective orders. At the July 10, 2017 hearing, mother asked Freeman about those petitions. Freeman admitted that a "CPS worker on [her] team" signed the petitions and affidavit for her. Freeman explained that she wrote the affidavit but did not sign it or appear before the intake officer because she "had a procedure that day and wasn't able to." Freeman had reviewed the case with the other CPS worker prior to the filing of the petitions and affidavit. Freeman confirmed that the other CPS worker's information about the case would have been "secondhand."

On November 24, 2014, the Roanoke County Juvenile and Domestic Relations District Court (the JDR court) entered an *ex parte* preliminary child protective order. On December 2, 2014, the JDR court conducted a hearing with all parties present and entered preliminary protective orders for the children. On December 3, 2014, Angie Wooten, a family services specialist with the Department, made a home visit. She offered numerous service referrals, but mother was not receptive. On December 19, 2014, the JDR court conducted another hearing, with all parties present, and entered preliminary child protective orders.

On January 22, 2015, the Department received a call regarding the welfare of the children and possible eviction of the family from their hotel room. At approximately 5:30 p.m., Wooten went to the parties' hotel room and spoke with mother.[2] Wooten found that the room was "cluttered, dirty dishes, dried food covered in the sink . . . . Dirty clothes were piled in the bathroom almost to the ceiling." The room also had a "strong odor." The Department determined that "the hotel room was not suitable . . . to leave the kids there for the night." Mother was argumentative and refused to answer many of the Department's questions. The police were called to the scene and instructed mother to cooperate with the Department. Mother eventually contacted the children's maternal grandmother, and mother, Wooten, and the maternal grandmother developed a verbal

---

[2] Father was at work.

safety plan. The maternal grandmother agreed to take the children to her house for the night, while the parents cleaned the room. At approximately 10:00 p.m., Wooten was called back to the hotel room because the maternal grandmother still had not taken the children to her home. Wooten then took the children into the Department's custody. The Department filed petitions for emergency removal of the children.

When the children entered foster care, all of them had head lice. L.M. was "very protective over her brothers" and, later, "displayed some sexual acting out behaviors against her siblings." L.M. was "socially isolated," "was behind her same age peers," and "had a hard time adjusting to the change." J.B. and K.B. had "poor personal boundary issues," and K.B. was educationally delayed. Initially, J.B., K.B., and L.M. were placed in the same foster home, but L.M. was removed in March 2015 due to inappropriate sexual behaviors.

On January 27, 2015, the JDR court entered preliminary removal orders and adjudicated that the children were abused or neglected. On February 27, 2015, the Department conducted a family partnership meeting in order to assess the family's needs and required the parents to participate in a parental capacity evaluation.[3] On March 17, 2015, the JDR court entered a dispositional order finding that the children were abused and neglected and approved the initial foster care plans with the concurrent goals of return home and relative placement.

While the children were in foster care, the Department offered weekly visitation to the parents. However, the Department suspended mother's visitation on April 20, 2015, based on the counselor's recommendations and mother's inappropriate behavior during visitations. On the other hand, father regularly visited with the children, and eventually visited with them in the community and in a supervised visitation setting. After consultation with the children's therapists, foster

---

[3] The Department continued to discuss with mother and father the need for the parental capacity evaluation throughout March, April, May, and June 2015.

parents, and the guardian *ad litem*, the Department ended father's visitation with J.B. on August 15, 2016, with L.M. on November 7, 2016, and with K.B. on November 14, 2016.

After an extensive investigation of possible relative placements, the Department ultimately concluded that there were no viable relative placements. The Department provided ongoing counseling for the children. The Department referred mother to a counselor, and mother participated in counseling from December 29, 2015 to March 2016. At the February 23, 2016 family partnership meeting, mother's counselor said that mother was not "emotionally ready yet" to resume supervised visitation with the children.

On March 1, 2016, CPS received a complaint against mother regarding L.M. and J.B. On April 22, 2016, there was a Level 1 finding of sexual abuse against mother. As a result of the Level 1 finding, the Department met with father on August 30, 2016, and asked him whether he would be willing to separate from mother and parent the children without her. Father told the Department that "he did not believe the allegations and that he would not be separating from [mother]." He explained that mother was appealing the finding and that he wanted to wait to see what happened with her appeal. The Department indicated that it was not willing to wait, especially since the children had been in foster care since January 22, 2015, and stopped offering services to father.

Since father was not willing to separate from mother and the children had been in foster care for more than twelve months, the Department filed foster care plans with the goal of adoption and petitions for termination of parental rights. On October 25, 2016, the JDR court terminated father and mother's parental rights and approved the foster care plans with the goal of adoption. Both parents appealed to the circuit court.

On July 10 and 11, 2017, the parties appeared before the circuit court. The Department presented evidence about the children's well-being. Initially, the children were placed in the same foster home, but later, were separated into different homes. Then, on May 15, 2017, K.B. moved

into J.B.'s foster home. K.B. and J.B. had "some struggles" and anxiety about living together again, so they were in counseling. L.M. also was in counseling and "doing well." She was doing well academically and had been involved in extracurricular activities. The foster parents told the Department that they would like to adopt the children.

At the conclusion of the Department's evidence, both parents made motions to strike, which the circuit court took under advisement. Then, after a recess, the parties announced that they had reached an agreement. Mother agreed to participate in individual counseling, meet with the children's counselors, sign all releases, participate in a psychiatric evaluation and comply with its recommendations, maintain stable housing, and complete a parenting class. Mother and father agreed to certain restrictions regarding social media. Furthermore, they agreed to cooperate and comply with the Department's requests and stay in contact with the Department. Father agreed to participate in individual counseling, meet with the children's counselors, sign all releases, maintain stable employment, maintain stable housing, and complete a parenting class. On July 21, 2017, the circuit court entered an order reflecting the parties' agreement and continuing the case to review the parents' compliance with the order or "a recommencement of the trial *de novo* of the Appeals."

On November 28, 2017, the parties appeared before the circuit court. Neither parent complied with all of the terms of the agreed order. The Department explained that after the July 11 hearing, the parents informed the Department that they had moved to New York City in November 2016. Additional evidence proved that mother had not participated in counseling, a psychiatric evaluation, or a parenting class. She had not maintained contact with the Department as ordered, and information regarding the children and the proceedings had appeared on social media in August, September, and November 2017. The Department also presented evidence that K.B. and J.B. were stable and living together in the same foster home. K.B. and J.B. were "struggling behaviorally" but participating in outpatient counseling. Meanwhile, L.M. had been in a treatment

- 6 -

facility for sexualized behavior since September 14, 2017. The Department indicated that L.M. was participating in counseling and was "beginning to progress."

After the Department presented its evidence at the November 28, 2017 hearing, mother and father renewed their motions to strike, which the circuit court overruled. Mother testified that she tried to get individual counseling, but admitted that she never participated in counseling after the July 11, 2017 hearing. In addition, she did not participate in a psychiatric evaluation or a parenting class because she could not find a provider in New York City. She also denied posting anything on social media and did not know how certain posts about the children and the proceedings appeared. She further acknowledged that she stopped providing updates to the Department because "nothing was changing."

At the conclusion of all of the evidence, mother renewed her motion to strike, which the circuit court denied. After hearing the parties' arguments, the circuit court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2) and held that the termination of mother's parental rights was in the best interests of the children.[4] In addition, the circuit court approved the foster care goal of adoption. On March 28, 2018, the circuit court entered an order memorializing its rulings.[5] This appeal followed.

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558, 811 S.E.2d 835, 840-41 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128,

---

[4] The circuit court also terminated father's parental rights to J.B. and K.B. He appealed that ruling to this Court. See Beim v. Roanoke Cty. Dep't of Soc. Servs., Record No. 0506-18-3.

[5] The March 28, 2018 order was a "supplemental corrected order" to correct a typographical error in the original order entered March 1, 2018.

409 S.E.2d 460, 463 (1991)).  "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it."  Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)).

*Termination of parental rights*

Mother argues that the circuit court erred in finding that she did not substantially remedy the conditions which led to, or required, the children's foster care placement.  The circuit court terminated mother's parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes."  Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005).  "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services."  Id. (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

On appeal, mother focuses on the August 17, 2016 permanency planning orders, which had concurrent goals of return home and adoption. Those orders stated that the circuit court made the following finding:

> Since return home remains that plan for the child: (i) the parent has made marked progress toward reunification with the child; (ii) the parent has maintained a close and positive relationship with the child; (iii) the child is likely to return home in the near future, although it is premature to set the exact date at the time of this hearing.

However, the corresponding foster care plans indicated that the Department was waiting for the results from the attachment assessments between father and the children, and until the results were received, "a determination regarding placement [was] unable to be made."

Mother argues that the Department "was, and is, collaterally estopped to argue that [mother] as of August 17, 2016, had not substantially remedied the conditions or reasons the Children either were placed in foster care or remained in foster care." She asserts that the evidence from the JDR court's hearing on August 17, 2016, until the circuit court's hearing on November 28, 2017, "did not rise to the level of clear and convincing evidence that [she] had not substantially improved either the conditions which led to the Children's placement in foster care or the conditions which required the Children's continued placement in foster care after August 18, 2016."

Mother had appealed the JDR court's rulings and appeared before the circuit court in a *de novo* hearing. See Code § 16.1-296(A). "A trial *de novo* in the circuit court 'annuls the judgment of the [juvenile court] as completely as if there had been no previous trial . . . and . . . grants to a litigant every advantage which would have been [available to the litigant] had the case been tried originally in [the circuit] court.'" Fairfax Cty. Dep't of Family Servs. v. D.N., 29 Va. App. 400, 406, 512 S.E.2d 830, 832-33 (1999) (quoting Walker v. Dept. of Public Welfare, 223 Va. 557, 563, 290 S.E.2d 887, 890 (1982)). "[A]t a trial *de novo* in the circuit court, the

parties are not restricted to the evidence presented before the juvenile court. The circuit court must consider all relevant evidence, even if such evidence had not been considered by the juvenile court." Id. The JDR court's records became part of the circuit court's records in this case; however, the circuit court heard new evidence of what mother had done, or not done, to remedy the situation since the JDR court's termination hearing.

On the second day of the circuit court hearing, the parties announced that they had reached an agreement. On July 21, 2017, the circuit court entered an agreed order, which required mother to participate in individual counseling, meet and cooperate with the children's counselors as recommended, remove or delete all posts and information on social media regarding the children and the proceedings, refrain from posting anything on social media about the children and the proceedings, update the Department by e-mail on the first and third Mondays of each month regarding her compliance with the terms of the agreement, maintain stable housing, sign releases, participate in family assessment and planning team meetings, respond to the Department's requests within twenty-four hours, undergo a psychiatric evaluation and comply with any recommendations, complete a parenting class, and cooperate with any additional services recommended by the Department at a later date.

At the next hearing on November 28, 2017, the Department presented evidence that mother had not complied with the terms of the agreed order. Mother and father had moved to New York City in November 2016, without notifying the Department until after the July 11, 2017 hearing. When the Department requested a copy of their lease, mother responded, "Since you will never let my kids come home without a Court Order, I see no point in providing you with a copy of a lease." Even though the Department referred mother to her former counselor, mother "declined the services because there was no visitation plan in place for her to see her children." The Department also tried to provide services to mother in New York City, but

mother never provided the Department with the contact information of a provider. Mother removed her Facebook page as of July 14, 2017, but new posts about the children and the proceedings appeared on social media in August, September, and November 2017. Mother did not participate in a psychiatric evaluation nor a parenting class. She did not respond to the Department within twenty-four hours and stopped contacting the Department after October 11, 2017. Mother testified that she did not send any further updates to the Department because "[n]othing had changed on [her] end. [She] hadn't found a counselor. [She] hadn't found a person to do the evaluation. [She] hadn't found anything."

The circuit court found that the parents' move to New York City was their choice and that the move made it difficult for them to comply with the court's order, but told mother that "they can't set up these straw men and create impediments and then say they can't comply because of the impediments they created." The circuit court further held that the agreed order required mother to comply with these new requirements, regardless of the prior orders, and mother did not comply with the terms of the agreed order nor remedy the conditions that led to the children's continued placement in foster care.

Based on the record, the circuit court did not err in terminating mother's parental rights pursuant to Code § 16.1-283(C)(2).

*Best interests of the children*

Mother argues that the circuit court erred in finding that the termination of her parental rights and adoption were in the best interests of the children. "When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 319, 746 S.E.2d 509, 521 (2013) (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463).

- 11 -

The evidence proved that the children had been in foster care since January 22, 2015. Contrary to mother's arguments, the Department presented evidence about the welfare of the children since the August 17, 2016 JDR court order. At the November 28, 2017 hearing, the social worker testified that L.M. had been in a treatment facility for sexualized behavior since September 14, 2017. The social worker reported that L.M. was participating in counseling and was "beginning to progress." L.M.'s foster parent told the Department that she wanted L.M. to be placed with her again after treatment, and the foster parent was visiting L.M. and participating in counseling. The social worker also testified that J.B. had been in the same foster home since July 2015, and K.B. had moved into J.B.'s foster home in May 2017. Their placements were "stable." Both J.B. and K.B. were "struggling behaviorally," but they were attending counseling.

As discussed above, mother was unable or unwilling to remedy the situation that led to the children being placed in, and remaining in, foster care. By the time of the final hearing, the children had been in foster care for almost three years. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Id. at 322, 746 S.E.2d at 522 (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)). Accordingly, the circuit court did not err in finding that it was in the children's best interests to terminate mother's parental rights and approve the goal of adoption.

*Relative placement*

Mother argues that the circuit court erred because it did not make a finding that the Department had investigated possible relative placements or that the Department was unable to

place the children with relatives. Mother further asserts that the evidence was insufficient to prove that the Department had investigated possible relative placements.[6]

Before terminating a parent's rights, "the court shall give a consideration to granting custody to relatives of the child, including grandparents." Code § 16.1-283(A). "This Court has held that this provision obligates [the Department] 'to produce sufficient evidence so that the court may properly determine whether there are relatives willing and suitable to take custody of the child, and to consider such relatives in comparison to other placement options.'" Castillo, 68 Va. App. at 567, 811 S.E.2d at 845 (quoting Brown v. Spotsylvania Dep't of Soc. Servs., 43 Va. App. 205, 217, 597 S.E.2d 214, 220 (2004)). "We do not suggest that the Department has a duty in every case to investigate the home of every relative of the children, however remote, as a potential placement." Id. (quoting Sauer v. Franklin Cty. Dep't of Soc. Servs., 18 Va. App. 769, 771, 446 S.E.2d 640, 642 (1994)).

The Department presented evidence about its investigation of possible relative placements. At the July 10, 2017 hearing, Wooten testified that mother told her on December 3, 2014, that the family was unable to move into the maternal grandmother's home because it was "too small" and "not suitable." The Department investigated the children's maternal grandmother and arranged for her to visit with the children when the children first entered foster care; however, the Department had to suspend her visitation because of inappropriate behavior during the visits. The maternal grandmother participated in a family partnership meeting shortly after the children were placed in foster care. The Department provided the maternal grandmother with the background check information and gave her the contact information for the

---

[6] For the first time on appeal, mother contends that the Department should have investigated relative placements after the August 17, 2016 order due to collateral estoppel constraints. "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Tackett, 62 Va. App. at 315, 746 S.E.2d at 519 (quoting Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998)); see Rule 5A:18.

kinship social worker, but she did not contact the social worker or complete the paperwork. In July 2015, the maternal grandmother told the Department that she doubted that her husband would be willing to go through the process.

The Department requested information about L.M.'s father and paternal relatives. Mother refused to disclose the name of L.M.'s biological father, so the Department was unable to search for any of L.M.'s paternal relatives.

The Department requested a list of possible relatives from mother and father, which they provided. The Department sent letters to those people on March 12, 2015. The Department spoke with a maternal relative who lived in California, but she indicated that she was not able to take the children. On December 11, 2015, mother's counsel provided the Department with another list of possible relatives. The Department sent letters to all of those possible relatives on the same day. As of the July 10, 2017 hearing, the Department had not received any positive responses from mother or father's relatives.

Although the circuit court did not make a finding regarding relative placement in its ruling from the bench, the circuit court's final order stated that the Department "has investigated placement of the children with relatives as required by statute and has been unable to place the children with any relative. The children are placed with a foster family." "[A] trial court speaks only through its written orders." Winslow, 40 Va. App. at 561, 580 S.E.2d at 465 (quoting Walton v. Commonwealth, 256 Va. 85, 94, 501 S.E.2d 134, 140 (1998)). Contrary to mother's arguments, the circuit court's final order stated the court's finding regarding relative placements. The record supports the court's finding that the Department sufficiently investigated possible relative placements.

- 14 -

*Initial petition for protective order*

Mother argues that the lower courts did not have jurisdiction over her because an attorney did not sign the initial petitions for a child protective order and the person who signed the affidavit did not have firsthand knowledge of the contents. Although Freeman testified that she prepared the petition and affidavit, she did not sign them, and instead, another CPS worker signed them for her. Mother contends that based on these errors, the entire matter should be dismissed.

Code § 16.1-260(A), governing the commencement of matters before juvenile and domestic relations district courts, directs that matters "alleged to be within the jurisdiction" of the juvenile and domestic relations district courts "shall be commenced by the filing of a petition" in accordance with Code § 16.1-262. Code § 16.1-262(C) requires the petition to be verified, and Code § 16.1-253 governs preliminary protective orders.[7] However, "[f]ailure to comply with the procedures set forth in [Code § 16.1-260] shall not divest the juvenile court of . . . jurisdiction." Code § 16.1-260(I).

Code § 63.2-332 states, "The local director shall designate nonattorney employees who are authorized to . . . initiate a case on behalf of the local department by appearing before an intake officer . . . ." Accordingly, an attorney was not required to sign the petition for the child protective order because a CPS worker appeared before the intake officer to request the petition. See also Rudolph v. City of Newport News Dep't of Human Servs., 67 Va. App. 140, 149, 793 S.E.2d 831, 836 (2016) (rejecting the contention that the "lower courts did not acquire active jurisdiction" even though a non-lawyer signed the petitions for emergency removal).

---

[7] According to Code § 16.1-253(B), a motion or petition for a preliminary protective order "shall be supported by an affidavit or by sworn testimony in person before the judge or intake officer." Freeman admitted that she wrote the affidavit that accompanied the petition for the preliminary protective order, but she did not sign it or appear before the intake officer.

The JDR court entered *ex parte* preliminary child protective orders on November 24, 2014. Then, on December 2, 2014, a hearing was held with all parties present, and the JDR court again issued preliminary child protective orders. Another hearing was held on December 19, 2014, with all parties present, and the JDR court again entered preliminary child protective orders.

Prior to the next scheduled court date, the Department filed separate petitions for the children's removal, and the matters were assigned different case numbers than the preliminary child protective orders. On January 27, 2015, the JDR court entered the preliminary removal orders. As the case progressed, the Department filed additional petitions, including the petitions to terminate mother's parental rights.

During the July 11, 2017 hearing, mother's counsel conceded that there was a separate petition for the emergency removal, and told the circuit court, "So I guess the Court has to decide even if the Protective Order was a nullity, does that even matter because there was another Removal Petition filed, a separate correct document." The circuit court held that any possible flaw in the petition for the child protective order did not impact the court's jurisdiction because all parties had notice of, and participated in, the remaining proceedings.

Code § 16.1-283(A) states, "No petition seeking termination of residual parental rights shall be accepted by the court prior to the filing of a foster care plan, pursuant to § 16.1-281, which documents termination of residual parental rights as being in the best interests of the child." The Department filed the requisite foster care plans and the petitions for termination of parental rights. Furthermore, mother had notice of, and participated in, the foster care proceedings, including the hearings regarding the termination of her parental rights.

Contrary to mother's arguments, the circuit court had jurisdiction to terminate mother's parental rights and approve the goal of adoption pursuant to the separate petitions filed by the

Department.  Accordingly, the circuit court had jurisdiction over the termination of parental rights and permanency foster care plans.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

<u>Affirmed.</u>